FILED

2004 JAN 16 P 2:10

DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LINDA STURM | | CIVIL ACTION NO. |
| | Plaintiff, | |
| v. | | 3:03CV0666 (AWT) |
| ROCKY HILL BOARD OF EDUCATION | | |
| | Defendant. | JANUARY 15, 2004 |

## COMPLAINT

**A.  PRELIMINARY STATEMENT:**

1. The plaintiff, Linda Sturm, is filing this lawsuit pursuant to 42 U.S.C. §1983, Conn. Gen. Stat. §31-51q, Section 504 of the Federal Rehabilitation Act and Connecticut common law defamation and wrongful discharge. Ms. Sturm was employed until June, 2002 by the defendant, Rocky Hill Board of Education ("defendant" or "Board") as a Special Education teacher. The Board retaliated against Ms. Sturm because of her opposition to the defendant's unlawful practices. The plaintiff was subjected to adverse terms and conditions of employment, including being terminated for exercising her rights protected by the First Amendment to the United States Constitution and the State Constitution of Connecticut.

**B.  PARTIES:**

2. During all times relevant to this Complaint, the plaintiff was an adult citizen of the United States residing in Middletown, Connecticut. Ms. Sturm was a school teacher at the Griswold Middle School in the Town of Rocky Hill School District.

3.      At all times relevant to this complaint, the Rocky Hill Board of Education was a governmental entity existing under the laws of the state of Connecticut. The defendant is located at 750 Old Main Street, Rocky Hill, CT 06067. The defendant is a "federal fund recipient" as defined by Section 504 of the Federal Rehabilitation Act.

**C.    JURISDICTION:**

5.      Jurisdiction of this Court is invoked under Section 1983 of Title 42 and §§1331 and 1343 of Title 28 of the United States Code. The court has pendent jurisdiction over the plaintiff's Connecticut claims which arise under the Constitution and laws of the State of Connecticut.

**D.    FACTS:**

6.      Ms. Sturm began working for the defendant in September 1998 as a Special Education Resource Teacher for Griswold Middle School. Ms. Sturm was employed to teach sixth grade Resource Room, including self-contained academics which consisted of Reading, English, Science, Social Studies and Math.

7.      When Ms. Sturm was hired the Principal, Laura Boutilier, told her that she hired her because Ms. Sturm was a strong advocate for Special Education students in the sixth grade. During Ms. Sturm's tenure at Griswold Middle School she received positive performance appraisals and numerous letters of appreciation from parents and the Principal, Laura Boutilier.

8.      During the 1999-2000 academic school year Ms. Boutilier was promoted to Assistant Superintendent, and Cori Marino, the Assistant Principal at the time, became Principal.

9.      Ms. Marino introduced a "co-teaching" model into the curriculum which required Ms. Sturm to teach Social Studies and Science with the "Mainstream" classroom teacher. (A mainstream classroom is primarily comprised of students who do not need special education and related services). The mainstream teachers initially opposed this proposal because they did not want another teacher intruding into their classrooms. The proposal was implemented, however, and Ms. Sturm took on the task of "co-teaching."

2

10. The defendant had a program in effect at the school district referred to as BRACES (Behavior, Rewards, Achievement, Consequences, Encouragement and Support). BRACES was a "... program designed for students who are identified as needing a highly structured program that incorporates clear behavioral expectations... [T]he goals of BRACES are to increase on-task behaviors, cooperativeness, and hands-off behavior; while decreasing disrespectfulness, inappropriate language and refusal to do school work ...." Nancy Love was assigned as the Program Coordinator.

11. The BRACES program was designed to meet the special education needs of certain students who met the programs' requirements.

12. Throughout Ms. Sturm's employment from September 1998 through June 2002 with the defendant she advocated for students to be moved into the mainstream classroom as well as to be placed in the BRACES program.

13. Ms. Sturm's advocacy on behalf of these students was consistent with one of the objectives of the Individual with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA") of integrating students into a regular education setting to the maximum extent possible, that is consistent with the student's individual needs. Ms. Sturm recommended that several students be placed in the BRACES program. Ms. Love and Ms. Marino continuously refused Ms. Sturm's repeated requests for placement into the BRACES program for a variety of students. In each instance, Ms. Sturm was reprimanded for recommending the BRACES program even though, in most cases, the student was ultimately placed in the program.

14. Ms. Sturm spent four (4) months advocating for the placement of a female student into the BRACES program to deal with the student's severe emotional problems. The student was eventually placed in the BRACES program and then outplaced to the Cromwell Children's Home because the school district could not meet her needs.

15. A male student with strong organizational and academic needs was refused placement into the BRACES program despite Ms. Sturm's request that he be placed in the

BRACES program. He was subsequently held back and forced to repeat 6th grade and then placed in the BRACES program the following year.

16. A male student identified with Pervasive Developmental Disorder ("PDD"), Attention Deficit Hyperactivity Disorder ("ADHD"), Generalized Anxiety Disorder and a phonological processing disorder was only placed in the BRACES program after Ms. Sturm advocated on his behalf for several months. When the student was finally placed, Ms. Love stated to Ms. Sturm that her BRACES Assistant, Ms. Anita Poehnert, told Ms. Love "was [the student] always this bad?"

17. A male student with behavioral problems who Ms. Sturm unsuccessfully sought to have placed in the BRACES program was eventually placed in the BRACES program after he was caught skipping numerous classes, stealing from the cafeteria and orchestrating a "scam" with the magazine drive to enable him to receive prizes for subscriptions he never sold.

18. A male student identified as "high risk" was recommended for placement in BRACES at his 5th grade year end PPT by Ms. Sturm but her recommendation was ignored.

19. A male student with severe anger and emotional issues was placed in Ms. Sturm's class for academic support. Ms. Sturm recommended placement into the BRACES program to the parents of the child but her request was rejected. The parents were unaware that the BRACES program was an option for their son. The student was eventually placed in the program the following year.

20. A male student who suffered from School Phobia was initially placed in Ms. Sturm's class for full-time academics. Ms. Marino removed the student from Ms. Sturm's class and placed him in the mainstream setting after Ms. Sturm continuously advocated for placement of the student into the BRACES program, thereby violating his Federal IEP. As a result, the student stopped attending school. The student was required to repeat 6th grade and subsequently placed in the BRACES program and out-placed to a clinical school setting.

21. A male student identified as Passive Oppositionality and ADHD suffered from severe anger, self-control issues and a learning disability. When the student was in 6th grade Ms. Sturm told the School Psychologist, Ted Dorrington, and Ms. Marino that this student should be placed in the BRACES program. Ms. Sturm's recommendation was denied. The student was finally placed in BRACES at the middle or end of his 8th grade school year.

22. In September 2001, Ms. Sturm advocated for the placement of a particular student, Jane Doe, into a mainstream Reading class. In Ms. Sturm's opinion, the student continued to need extra support from BRACES because of the student's refusal to do homework and other behavioral problems. Ms. Sturm's recommendation was confirmed at the student's Planning and Placement Team Meeting ("PPT"). For each student who qualifies for special education services under the IDEA the school district is required to develop a Individualized Education Program ("IEP") and hold at least one PPT a year to discuss with the family the student's goals and objectives according to the student's IEP. Ms. Love, the BRACES coordinator, was not present at the Jane Doe's PPT.

23. On November 8, 2001, Ms. Sturm was called into a meeting with the Principal, Ms. Marino, the School Psychology Intern, Debora Levine, the School Psychologist, Ted Dorrington, the Guidance Counselor, Dolores Callagher and Ms. Love. Ms. Marino and Ms. Love accused Ms. Sturm of "going behind their backs" by recommending that Jane Doe be placed into the mainstream reading class. Ms. Love wanted, instead, to move her out of one of her BRACES period and into a social studies class.

24. In or around November 2001, Mr. Dorrington approached Ms. Sturm regarding a student, John Doe. Mr. Dorrington stated that he thought John Doe needed to be in the BRACES program. Ms. Sturm agreed with his assessment. Mr. Dorrington asked if Ms. Sturm would be willing to make a "trade" by supporting the removal of Jane Doe out of the BRACES program so there would be room for John Doe. Ms. Sturm refused his proposal because it would force Jane Doe to be denied the benefit of the BRACES program which she clearly

5

needed and to which she was entitled. Because Ms. Sturm would not agree to the "trade," John Doe was placed in Ms. Sturm's classroom and denied placement into the BRACES program.

25. In December 2001, Ms. Sturm approached Ms. Marino regarding four female students in her class. Ms. Sturm explained that the students were exceptionally troublesome, both academically and emotionally. After consulting with all the academic teachers on both sixth grade teams and the school guidance counselor, Ms. Lisa Brockel, Ms. Sturm requested that these particular students be separated. Ms. Marino dismissed Ms. Sturm's concerns as a "non-issue."

26. In January 2002, Ms. Marino called a meeting with Ms. Sturm, Director of Pupil Services, Ms. Young and herself. At that meeting, Ms. Marino accused Ms. Sturm of being "sneaky" because she inquired at a PPT whether or not a student would benefit from counseling sessions. Ms. Young informed Ms. Sturm that she was not allowed to ask any questions of a non-academic nature at a PPT. Ms. Marino also accused Ms. Sturm of being negligent in her performance with her students. To support her allegation, Ms. Marino stated that Ms. Sturm had failed in her obligation to educate two particular students. However, Ms. Sturm told her that there was documentation showing that both of these students' had improved. Ms. Marino ordered Ms. Sturm to document her whereabouts for the previous four months when she was not attending PPT meetings. Ms. Sturm explained to Ms. Marino that, like all Special Education Teachers, she conducted evaluations, wrote and reviewed evaluation reports and modified student's IEP reports when she was not attending PPT meetings. Ms. Marino responded she "did not care what the other teachers were doing" and that Ms. Sturm had to be in her mainstream academic classes (whether there were PPT hours or not) at all times and any other school work had to be done on her personal plan time. Ms. Marino concluded by accusing Ms. Sturm of having conflicts with her colleagues but refused to identify the colleagues with whom she purportedly had conflicts.

6

27. In March 6, 2002, Ms. Sturm received a memo from Ms. Young and Ms. Marino claiming that Ms. Sturm had left the building on January 30, 2002 during a contractual teaching period without notifying an administrator and signing out. The memo stated that Ms. Sturm was in violation of her contract. Ms. Sturm explained to Ms. Marino that she did leave the building but not during her teaching period. The memo also stated an unsupported accusation that Ms. Sturm left the building on January 29, 2002 during a contractual teaching period. Ms. Sturm explained to Ms. Marino that she did not leave the building on this date or during any contractual teaching periods.

28. A meeting was held to review Ms. Sturm's end of the year evaluation on or around March 12, 2002. Ms. Marino, Ms. Young, Union Representative Pat Crawford, and Ms. Sturm attended the meeting. The evaluation contained an unsupported accusation that Ms. Sturm had conflicts with her colleagues that required administrative intervention. (Ms. Sturm's colleagues later denied ever complaining about Ms. Sturm or having any work-related problems with her.) The report also indicated that Ms. Sturm left her classroom in the hands of a paraprofessional. Ms. Sturm explained that the allegations in her evaluation were false and she refused to sign the appraisal until she was given an opportunity to note her rebuttal.

29. On March 15, 2002, Ms. Marino informed Ms. Sturm that her contract would not be renewed and that she was not able to transfer to another school within the district. Ms. Marino cried throughout their discussion. Ms. Marino said that Ms. Sturm was "truly a wonderful teacher" and that she had no doubt that she would be "teacher of the year in another district in no time" but that Ms. Sturm was not a "good fit" with the team Ms. Marino was trying to build. Ms. Marino elaborated that she "had to do this before [Ms. Sturm] made tenure because then it would become more complicated." Ms. Marino gave Ms. Sturm the option of resigning so her name did not appear on a list of "non-renewals," and as a result, Ms. Sturm resigned.

29. In or around March 2002, Ms. Sturm suffered from severe depression due to her imminent termination. As a result, Ms. Marino, Superintendent Dr. Camille Vautour, and Union

7

Representative, Ms. Crawford, arranged for Ms. Sturm to work from home from April 2002 until June 2002. During that time, Ms. Sturm worked on a project with Ms. Boutillier. Ms. Sturm was responsible for remodeling the orientation program for new teachers. Ms. Sturm's employment ended on June 20, 2002 at the end of the school year.

30. Any reasonable person in the plaintiff's position who was subjected to the actions the plaintiff was subjected to would have resigned and, therefore, the plaintiff was constructively discharged.

31. In February 2003, Ms. Sturm interviewed for a position as a part-time special education teacher at Glastonbury School District. Ms. Sturm interviewed with Thomas Russo, Principal, Donna Shulkey, Assistant Principal, Leslie Roulier, Special Education Director, and Mel Tulin, Head Special Education Teacher at Smith Middle School. Mr. Russo told Ms. Sturm that her credentials were impeccable and that they believed she could get a teaching position anywhere. At the conclusion of Ms. Sturm's interview, Mr. Russo stated, "I think I speak for the whole group when I say we are interested if you are and we want to send you to our Superintendent for the final OK." Mr. Russo told Ms. Sturm that the only remaining procedural requirement was to check her references before arranging an interview for her with the Superintendent. Mr. Russo mentioned that he knew Ms. Marino. Mr. Russo then asked Ms. Tulin to give Ms. Sturm a tour of the school. Ms. Tulin introduced Ms. Sturm as "hopefully our new special education teacher – she got the thumbs up from the committee." Ms. Tulin gave Ms. Sturm her home telephone number and told her to call with any questions and "not to worry."

32. After several weeks of not hearing a response, Ms. Sturm called Ms. Tulin to inquire into the status of her application to the Glastonbury School District. Ms. Tulin did not return her phone calls. Ms. Sturm also contacted Mr. Russo, who told her that the Superintendent of Glastonbury, Dr. Jacqueline Jacoby, did not want to see only one candidate

and that they decided not to send her for an interview with Dr. Jacoby. No further explanation was given.

33. On February 27, 2003, Ms. Sturm received a letter from Glastonbury denying her application for employment.

34. The plaintiff has lost wages and benefits and suffered emotional pain and suffering.

### D.  LEGAL CLAIMS:

### FIRST COUNT - 42 U.S.C. §1983

35. Paragraphs 1-34 are incorporated by reference the same as if fully pled in this First Count.

36. Ms. Sturm advocated on behalf of her students with Special Education needs.

37. As a result of plaintiff's advocacy for her students with Special Education needs the defendant subjected the plaintiff to adverse terms and conditions of employment including, but not limited to, fabricating criticism of her job performance, refusing to renew her contract, refusing to allow her to transfer to another school within the school district and terminating her. The defendant's actions violated the plaintiff's First Amendment right under the United States Constitution and 42 U.S.C. §1983.

38. The plaintiff is entitled to her loss wages and benefits, compensatory damages, punitive damages and attorney's fees and costs as a result of defendant's violation of 42 U.S.C. §1983.

### SECOND COUNT – C.G.S. §31-51q

39. Paragraphs 1-34 are incorporated by reference the same as if fully pled in this Second Count.

40. The plaintiff's speech and actions involved matters of public concern and are protected by the First Amendment to the United States Constitution and the corresponding provisions of the Connecticut State Constitution.

41. The plaintiff's exercise of her rights guaranteed by the First Amendment to the United States Constitution and the corresponding provisions of the Connecticut State Constitution was a substantive factor which led the defendant to subject the plaintiff to adverse terms and conditions of employment and constructively discharging her.

42. The plaintiff is entitled to her loss of wages and benefits, compensatory damages, punitive damages and attorney's fees and costs as a result of the defendants violation of C.G.S. §31-51q.

## THIRD COUNT - §504 OF THE REHABILITATION ACT

43. Paragraphs 1-34 are incorporated by reference the same as if fully pled in this Third Count.

44. The adverse employment actions set forth above were done to retaliate against Ms. Sturm because she engaged in activities that are protected under Section 504.

45. The plaintiff is entitled to her loss of wages and benefits, compensatory damages, punitive damages and attorney's fees and costs as a result of the defendant's violation of §504 of the Rehabilitation Act.

## FOURTH COUNT – DEFAMATION (FALSE LIGHT INVASION OF PRIVACY)

46. Paragraphs 1-34 are incorporated by reference the same as if fully pled in this Fourth Count.

47. In February 2003, Ms. Sturm interviewed for a special education teaching position at Glastonbury School District. Ms. Sturm was told by Mr. Russo that she had impeccable credentials and could go anywhere. Mr. Russo led Ms. Sturm to believe that she was going to be hired by Glastonbury and the only remaining procedure was to check her references before arranging an interview with the Superintendent. Mr. Russo told Ms. Sturm that he knew Ms. Marino well. Mr. Russo also stated that he would call Ms. Sturm's references immediately to expedite the hiring process.

48. During his reference check, Mr. Russo, a principal in the Glastonbury School District, spoke to Carey Miller, who worked as a principal for the defendant. In response to a question asked by Mr. Russo, Ms. Miller told Mr. Russo that the defendant would not "rehire" the plaintiff.

49. During his reference check, Mr. Russo, from the Glastonbury School District, spoke to Ruth Young, who was in charge of Special Education for the defendant. In response to a question asked by Mr. Russo, Ms. Young said that the defendant would not "rehire" the plaintiff.

50. Ms. Miller and Ms. Young's aforesaid statements that the defendant would not rehire the plaintiff were intentional and malicious.

51. Ms. Miller and Ms. Young's aforesaid statements that the defendant would not rehire the plaintiff were made to retaliate against the plaintiff because of her advocacy on behalf of her students with Special Education needs.

52. Ms. Young's aforesaid statement that the defendant would not rehire the plaintiff was made while she was carrying out her duties as an employee of the defendant and was authorized and approved by the defendant.

53. Ms. Miller's aforesaid statement that the defendant would not rehire the plaintiff was made while she was carrying out her duties as an employee of the defendant and was authorized and approved by the defendant.

54. Conn. Gen. Stat. §§ 31-128f provides, in relevant part, that no individually identifiable information contained in an employee's personnel file can be disclosed to a third party without the employee's written authorization except where the information is limited to verifying the individual's duties of employment, title or position and wage or salary.

55. Linda Sturm did not authorize the defendant or any of the defendant's authorized representatives to tell anyone from the Glastonbury School District whether the defendant would rehire her.

56. As a result of Ms. Miller and Ms. Young's disclosures to Mr. Russo that the defendant would not rehire the plaintiff, the defendant violated Conn. Gen. Stat. §§31-128f.

57. On information and belief, Ms. Sturm was denied employment by the Glastonbury Board of Education because Mr. Russo was told by Ms. Young and Ms. Miller when they were contacted about a reference that the defendant would not rehire the plaintiff.

58. On information and belief, the information supplied by Ms. Young to the Glastonbury Board of Education was false and placed the plaintiff in a false light and was an invasion of the plaintiff's privacy.

59. The plaintiff is entitled to her loss of wages and benefits and emotional distress damages.

**FIFTH COUNT – WRONGFUL DISCHARGE**

60. Paragraphs 1-34 are incorporated by reference the same as if fully pled in this Fifth Count.

61. The defendant terminated Ms. Sturm's employment on June 20, 2002 at the end of the school year. The defendant retaliated against the plaintiff because of actions she took in furtherance of state and federal public policy.

62. The plaintiff is entitled to her loss of wages and benefits, reinstatement and/or front pay, compensatory damages, punitive damages and attorney's fees and costs.

63. Rocky Hill Board of Education is liable for wrongful discharge.

WHEREFORE, the plaintiff demands the following relief against the defendants, as follows:

(a) Back Pay;

(b) Reinstatement and/or front pay;

(c) Compensatory Damages;

(d) Payment of punitive damages;

(e) Payment of attorney's fees and cost; and

(f) Such other relief as this Court deems just and equitable.

THE PLAINTIFF,

LINDA STURM

By _____

Gary Phelan (ct 03670)
Gary Phelan, L.L.C.
433 South Main Street, Suite 117
West Hartford, CT 06110
(860) 313-5005