UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA STURM,                                        CIVIL ACTION NO.:

        Plaintiff                              3:03CV0666(AWT)

v.

ROCKY HILL BOARD OF EDUCATION,

        Defendant.                             April  2, 2004

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The defendant, Rocky Hill Board of Education ("Rocky Hill") has filed a motion under

Fed.  R. Civ. P. 12(b)(6) to dismiss Linda Sturm's claims in its entirety, contending that:  (1) the

plaintiff's speech is not protected by the First Amendment or the Connecticut state constitution;

(2)  the plaintiff does not have a "disability" in accordance with Section 504 of the Rehabilitation

Act; (3)  the plaintiff has not adequately pled a claim for defamation and false light and the

defendant is protected by the defense of governmental immunity for those claims; and (4) the

plaintiff failed to satisfy the pleading requirements for the common law claim of wrongful

discharge.  For the reasons discussed below, the defendant's motion should be dismissed and

the plaintiff should be allowed to present her case to a jury.

I.    **FACTS**

Ms. Sturm began working for the defendant in September 1998 as a Special Education

Resource Teacher for Griswold Middle School.  Ms. Sturm was employed to teach sixth grade

Resource Room, including self-contained academics which consisted of Reading, English,

Science, Social Studies and Math.  Complaint ¶ 6.

When Ms. Sturm was hired the Principal, Laura Boutilier, told her that she hired her

because Ms. Sturm was a strong advocate for Special Education students in the sixth grade.

Complaint ¶ 7. During Ms. Sturm's tenure at Griswold Middle School she received positive

performance appraisals and numerous letters of appreciation from parents and the Principal, Laura Boutilier. Complaint ¶ 7.

During the 1999-2000 academic school year Ms. Boutilier was promoted to Assistant Superintendent, and Cori Marino, the Assistant Principal at the time, became Principal. Complaint ¶ 8.

Ms. Marino introduced a "co-teaching" model into the curriculum which required Ms. Sturm to teach Social Studies and Science with the "Mainstream" classroom teacher. (A mainstream classroom is primarily comprised of students who do not need special education and related services). Complaint ¶ 9. The mainstream teachers initially opposed this proposal because they did not want another teacher intruding into their classrooms. Complaint ¶ 9. The proposal was implemented, however, and Ms. Sturm took on the task of "co-teaching." Complaint ¶ 9.

The defendant had a program in effect at the school district referred to as BRACES (Behavior, Rewards, Achievement, Consequences, Encouragement and Support). Complaint ¶ 10. BRACES was a "… program designed for students who are identified as needing a highly structured program that incorporates clear behavioral expectations… [T]he goals of BRACES are to increase on-task behaviors, cooperativeness, and hands-off behavior; while decreasing disrespectfulness, inappropriate language and refusal to do school work …." Nancy Love was assigned as the Program Coordinator. Complaint ¶ 10.

Throughout Ms. Sturm's employment from September 1998 through June 2002 with the defendant she advocated for students to be moved into the mainstream classroom as well as to be placed in the BRACES program. Complaint ¶ 12.

Ms. Sturm's advocacy on behalf of these students was consistent with one of the objectives of the Individual with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA") of integrating students into a regular education setting to the maximum extent possible, that is consistent with the student's individual needs. Complaint ¶ 13. Ms. Sturm recommended that

several students be placed in the BRACES program. Ms. Love and Ms. Marino continuously refused Ms. Sturm's repeated requests for placement into the BRACES program for a variety of students. In each instance, Ms. Sturm was reprimanded for recommending the BRACES program even though, in most cases, the student was ultimately placed in the program. Complaint ¶ 13.

Ms. Sturm spent four (4) months advocating for the placement of a female student into the BRACES program to deal with the student's severe emotional problems. The student was eventually placed in the BRACES program and then outplaced to the Cromwell Children's Home because the school district could not meet her needs. Complaint ¶ 14.

A male student with strong organizational and academic needs was refused placement into the BRACES program despite Ms. Sturm's request that he be placed in the BRACES program. He was subsequently held back and forced to repeat 6th grade and then placed in the BRACES program the following year. Complaint ¶ 15.

A male student identified with Pervasive Developmental Disorder ("PDD"), Attention Deficit Hyperactivity Disorder ("ADHD"), Generalized Anxiety Disorder and a phonological processing disorder was only placed in the BRACES program after Ms. Sturm advocated on his behalf for several months. When the student was finally placed, Ms. Love stated to Ms. Sturm that her BRACES Assistant, Ms. Anita Poehnert, told Ms. Love "was [the student] always this bad?" Complaint ¶ 16.

A male student with behavioral problems who Ms. Sturm unsuccessfully sought to have placed in the BRACES program was eventually placed in the BRACES program after he was caught skipping numerous classes, stealing from the cafeteria and orchestrating a "scam" with the magazine drive to enable him to receive prizes for subscriptions he never sold. Complaint ¶ 17.

A male student identified as "high risk" was recommended for placement in BRACES at his 5th grade year end PPT by Ms. Sturm but her recommendation was ignored. Complaint ¶ 18.

A male student with severe anger and emotional issues was placed in Ms. Sturm's class for academic support. Ms. Sturm recommended placement into the BRACES program to the parents of the child but her request was rejected. The parents were unaware that the BRACES program was an option for their son. The student was eventually placed in the program the following year. Complaint ¶ 19. A male student who suffered from School Phobia was initially placed in Ms. Sturm's class for full-time academics. Ms. Marino removed the student from Ms. Sturm's class and placed him in the mainstream setting after Ms. Sturm continuously advocated for placement of the student into the BRACES program, thereby violating his Federal IEP. As a result, the student stopped attending school. The student was required to repeat 6th grade and subsequently placed in the BRACES program and out-placed to a clinical school setting. Complaint ¶ 20.

A male student identified as Passive Oppositionality and ADHD suffered from severe anger, self-control issues and a learning disability. Complaint ¶ 21. When the student was in 6th grade Ms. Sturm told the School Psychologist, Ted Dorrington, and Ms. Marino that this student should be placed in the BRACES program. Ms. Sturm's recommendation was denied. The student was finally placed in BRACES at the middle or end of his 8th grade school year. Complaint ¶ 21.

In September 2001, Ms. Sturm advocated for the placement of a particular student, Jane Doe, into a mainstream Reading class. In Ms. Sturm's opinion, the student continued to need extra support from BRACES because of the student's refusal to do homework and other behavioral problems. Ms. Sturm's recommendation was confirmed at the student's Planning and Placement Team Meeting ("PPT"). For each student who qualifies for special education services under the IDEA the school district is required to develop a Individualized Education Program ("IEP") and hold at least one PPT a year to discuss with the family the student's goals and objectives according to the student's IEP. Ms. Love, the BRACES coordinator, was not present at the Jane Doe's PPT. Complaint ¶ 22.

On November 8, 2001, Ms. Sturm was called into a meeting with the Principal, Ms. Marino, the School Psychology Intern, Debora Levine, the School Psychologist, Ted Dorrington, the Guidance Counselor, Dolores Callagher and Ms. Love.  Ms. Marino and Ms. Love accused Ms. Sturm of "going behind their backs" by recommending that Jane Doe be placed into the mainstream reading class.  Ms. Love wanted, instead, to move her out of one of her BRACES period and into a social studies class.  Complaint ¶ 23.

In or around November 2001, Mr. Dorrington approached Ms. Sturm regarding a student, John Doe.  Mr. Dorrington stated that he thought John Doe needed to be in the BRACES program.  Ms. Sturm agreed with his assessment.  Complaint ¶ 24.  Mr. Dorrington asked if Ms. Sturm would be willing to make a "trade" by supporting the removal of Jane Doe out of the BRACES program so there would be room for John Doe.  Ms. Sturm refused his proposal because it would force Jane Doe to be denied the benefit of the BRACES program which she clearly needed and to which she was entitled.  Because Ms. Sturm would not agree to the "trade," John Doe was placed in Ms. Sturm's classroom and denied placement into the BRACES program.  Complaint ¶ 24.

In December 2001, Ms. Sturm approached Ms. Marino regarding four female students in her class.  Ms. Sturm explained that the students were exceptionally troublesome, both academically and emotionally. Complaint ¶ 25.  After consulting with all the academic teachers on both sixth grade teams and the school guidance counselor, Ms. Lisa Brockel, Ms. Sturm requested that these particular students be separated.  Ms. Marino dismissed Ms. Sturm's concerns as a "non-issue."  Complaint ¶ 25.

In January 2002, Ms. Marino called a meeting with Ms. Sturm, Director of Pupil Services, Ms. Young and herself.  At that meeting, Ms. Marino accused Ms. Sturm of being "sneaky" because she inquired at a PPT whether or not a student would benefit from counseling sessions.  Complaint ¶ 26.  Ms. Young informed Ms. Sturm that she was not allowed to ask any questions of a non-academic nature at a PPT.  Complaint ¶ 26.  Ms. Marino also accused Ms.

Sturm of being negligent in her performance with her students. To support her allegation, Ms. Marino stated that Ms. Sturm had failed in her obligation to educate two particular students. Complaint ¶ 26. However, Ms. Sturm told her that there was documentation showing that both of these students' had improved. Ms. Marino ordered Ms. Sturm to document her whereabouts for the previous four months when she was not attending PPT meetings. Complaint ¶ 26. Ms. Sturm explained to Ms. Marino that, like all Special Education Teachers, she conducted evaluations, wrote and reviewed evaluation reports and modified student's IEP reports when she was not attending PPT meetings. Complaint ¶ 26. Ms. Marino responded she "did not care what the other teachers were doing" and that Ms. Sturm had to be in her mainstream academic classes (whether there were PPT hours or not) at all times and any other school work had to be done on her personal plan time. Complaint ¶ 26. Ms. Marino concluded by accusing Ms. Sturm of having conflicts with her colleagues but refused to identify the colleagues with whom she purportedly had conflicts. Complaint ¶ 26.

In March 6, 2002, Ms. Sturm received a memo from Ms. Young and Ms. Marino claiming that Ms. Sturm had left the building on January 30, 2002 during a contractual teaching period without notifying an administrator and signing out. Complaint ¶ 27. The memo stated that Ms. Sturm was in violation of her contract. Ms. Sturm explained to Ms. Marino that she did leave the building but not during her teaching period. The memo also stated an unsupported accusation that Ms. Sturm left the building on January 29, 2002 during a contractual teaching period. Ms. Sturm explained to Ms. Marino that she did not leave the building on this date or during any contractual teaching periods. Complaint ¶ 27.

A meeting was held to review Ms. Sturm's end of the year evaluation on or around March 12, 2002. Ms. Marino, Ms. Young, Union Representative Pat Crawford, and Ms. Sturm attended the meeting. The evaluation contained an unsupported accusation that Ms. Sturm had conflicts with her colleagues that required administrative intervention. (Ms. Sturm's colleagues later denied ever complaining about Ms. Sturm or having any work-related problems with her.) The

report also indicated that Ms. Sturm left her classroom in the hands of a paraprofessional. Ms. Sturm explained that the allegations in her evaluation were false and she refused to sign the appraisal until she was given an opportunity to note her rebuttal. Complaint ¶ 28.

On March 15, 2002, Ms. Marino informed Ms. Sturm that her contract would not be renewed and that she was not able to transfer to another school within the district. Ms. Marino cried throughout their discussion. Ms. Marino said that Ms. Sturm was "truly a wonderful teacher" and that she had no doubt that she would be "teacher of the year in another district in no time" but that Ms. Sturm was not a "good fit" with the team Ms. Marino was trying to build. Ms. Marino elaborated that she "had to do this before [Ms. Sturm] made tenure because then it would become more complicated." Ms. Marino gave Ms. Sturm the option of resigning so her name did not appear on a list of "non-renewals," and as a result, Ms. Sturm resigned. Complaint ¶ 29.

In or around March 2002, Ms. Sturm suffered from severe depression due to her imminent termination. As a result, Ms. Marino, Superintendent Dr. Camille Vautour, and Union Representative, Ms. Crawford, arranged for Ms. Sturm to work from home from April 2002 until June 2002. During that time, Ms. Sturm worked on a project with Ms. Boutillier. Ms. Sturm was responsible for remodeling the orientation program for new teachers. Ms. Sturm's employment ended on June 20, 2002 at the end of the school year. Complaint ¶ 30.

In February 2003, Ms. Sturm interviewed for a position as a part-time special education teacher at Glastonbury School District. Ms. Sturm interviewed with Thomas Russo, Principal, Donna Shulkey, Assistant Principal, Leslie Roulier, Special Education Director, and Mel Tulin, Head Special Education Teacher at Smith Middle School. Complaint ¶ 32. Mr. Russo told Ms. Sturm that her credentials were impeccable and that they believed she could get a teaching position anywhere. At the conclusion of Ms. Sturm's interview, Mr. Russo stated, "I think I speak for the whole group when I say we are interested if you are and we want to send you to our Superintendent for the final OK." Complaint ¶ 32. Mr. Russo told Ms. Sturm that the only

remaining procedural requirement was to check her references before arranging an interview for her with the Superintendent. Mr. Russo mentioned that he knew Ms. Marino. Mr. Russo then asked Ms. Tulin to give Ms. Sturm a tour of the school. Ms. Tulin introduced Ms. Sturm as "hopefully our new special education teacher – she got the thumbs up from the committee." Ms. Tulin gave Ms. Sturm her home telephone number and told her to call with any questions and "not to worry." Complaint ¶ 32.

After several weeks of not hearing a response, Ms. Sturm called Ms. Tulin to inquire into the status of her application to the Glastonbury School District. Ms. Tulin did not return her phone calls. Ms. Sturm also contacted Mr. Russo, who told her that the Superintendent of Glastonbury, Dr. Jacqueline Jacoby, did not want to see only one candidate and that they decided not to send her for an interview with Dr. Jacoby. No further explanation was given. Complaint ¶ 33. On February 27, 2003, Ms. Sturm received a letter from Glastonbury denying her application for employment. Complaint ¶ 34.

## II.    STANDARD OF REVIEW

When examining a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true all of the allegations contained in the plaintiffs' complaint and draw all inferences in favor of the plaintiff. IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1058 (2d Cir. 1993). A court can only dismiss a complaint "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). A complaint should not be dismissed unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief." Lyons v. Legal Aid Society, 68 F.3d 1512, 1514 (2d Cir. 1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Second Circuit has held that even if "recovery may appear remote and unlikely on the face of the pleading … that is not the test for dismissal." Bernheim v. Litt, 79 F.3d 318, 321 (2d. Cir. 1996), quoting Gant v. Wallingford Bd. Of Educ., 69 F.3d 669, 673 (2d. Cir. 1995)

(citing <u>Scheuer</u>, 416 U.S. at 236). Furthermore, the "'standard is applied with even greater force where the plaintiff alleges civil rights violations....'" <u>Id.</u> (quoting <u>Hernandez</u>, 18 F.3d at 136). The Supreme Court has stated in <u>Gomez v. Toledo</u>, 446 U.S. 635 (1980), that "by the plain terms of § 1983, two--and only two--allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person[1] has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." <u>Id.</u> at 640.

In <u>Swierkiewicz v. Sorema</u>, <u>N. A.</u> 534 U.S. 506, 512 (2002), the Supreme Court clarified that under Fed. R. Civ. P. 8(a)'s liberal pleading standards, a plaintiff in an employment discrimination case is merely required to give the employer "fair notice" of the plaintiff's claims and the grounds on which they rest. <u>Id.</u> (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). In <u>Brown v. Western Connecticut State University</u>, 204 F. Supp. 2d 355, 363 (2002), Judge Janet Bond Arterton applied the Supreme Court's liberal pleading standard to a § 1983 claim. According to Judge Arterton, the Supreme Court recognized that "such a liberal pleadings rule might result in allowing lawsuits based on somewhat conclusory allegations to go forward." <u>Brown</u>, 204 F. Supp. 2d at 363 (citing <u>Swierkiewicz</u>, 122 S. Ct. at 999).

## III.    LEGAL ARGUMENT

### A.    PLAINTIFF'S SPEECH IS ENTITLED TO FIRST AMENDMENT PROTECTION, PURSUANT TO SECTION 1983

**1.    Plaintiff's speech entails a matter of "public concern."**

In <u>Connick v. Myers</u>, 461 U.S. 138 (1983), the Supreme Court stated that, a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." <u>Id.</u> at 140 (citing <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968)). For over twenty-five years the courts have refined the principals

---

[1] In <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658, 690 (1978), the United States Supreme Court held that "Congress *did* intend munipalities and other local government units to be included among those persons to whom § 1983 applies." (Emphasis in the original).

articulated in <u>Pickering.</u>  The Supreme Court has declined to "lay down a general standard against which all statements may be judged." <u>Pickering,</u> 391 U.S. at 569.  Rather, the Supreme Court has explained that courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Id.</u> at 568. The salient question becomes:  what is a matter of "public concern?"  In <u>Connick,</u> the Court stated that, when assessing whether an employee's speech is a matter of public concern, a court should look to content, form, and context of the given statement as revealed by the entire record.  461 U.S. at 147-48.

Linda Sturm's speech clearly involves a matter of public concern and, therefore, is entitled to First Amendment protection.

### a.    The context and form of the plaintiff's speech constitutes a matter of "public concern."

According to the defendant, Sturm's speech is not considered a matter of "public concern" under <u>Connick</u> because: (1) the disputed speech was not broadcast to the public; (2) the disputed speech was not intended to bring wrongdoing or other issues of public concern to light; and (3) the intended target of the disputed speech was not a public audience. Rather, the defendant maintains that the plaintiff was voicing her disagreements in private amongst her fellow teachers and school administrators.  See Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Def. Mem. of Law"), at 10.

The defendant's argument that Sturm's speech is not a matter of public concern is wrong.  First of all, a plaintiff's speech does not have to be broadcast to the public in order to be of public concern.  In <u>Connick v. Myers,</u> 461 U.S. 138, 146 (1983), the Supreme Court repeated its holding in <u>Givhan v. Western Line Consolidated School District,</u> 439 U.S. 410 (1979), that "First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publically." <u>Id.</u>  The plaintiff's free speech

claim in Givhan arose from a series of private complaints by the plaintiff to her school principal that both her school and school district's employment policies and practices were racially discriminatory. Id. at 412-13. The Supreme Court held that a public employee's "protected free speech rights are not lost simply because the speech is communicated privately to the employer rather than to the public." Id. at 415-16.

Second, the defendant extracts single phrases from primarily Seventh Circuit decisions to support its argument that the plaintiff's speech was not intended to bring wrongdoing or other issues of public concern to light. The defendant first refers to Kokkinis v. Ivkovick, 185 F. 3d 840, 844 (7th Cir. 1999), which states that "simply because a topic might be of some interest to the public does not automatically mean that an employee's statements on that topic address a matter of public concern as that term is employed in Connick." See Def. Mem. of Law at 9. In Kokkinis, a patrol officer was asked by a news reporter for a comment about an alleged sex discrimination claim within the police department. Instead of speaking about sex discrimination within the police force, which the Second Circuit implied would be a matter of public concern, the "entire content' of [the plaintiff's] statements consisted only of his personal view that the Chief is vindictive and did not even mention Walsh [police offer] or her charge of sex discrimination." Id. at 843. The Kokkinis court was not going to allow the plaintiff to bootstrap his own personal grievances to a genuine matter of public concern, i.e., sex discrimination. There is nothing in the complaint indicating that Sturm was trying to "piggyback" her personal grievances onto legitimate matters of public concern. Rather, she vigorously advocated on behalf of her special education students.

The defendant then quotes Vukadinovich v. Bartels, 853 F.2d 1387, 1390-91 (7th Cir. 1988) which stated that, "[t]he court must consider whether the speaker's point was to bring wrongdoing to light or to raise other issues of public concern ... or to further a purely private interest." In Vukadinovich, the plaintiff spoke to a local newspaper reporter about his dissatisfaction with the school board's decision to replace him as the high school basketball

11

coach. Id. at 1388. The court observed that the plaintiff "did not comment about any possible improper motives or procedures regarding the defendant's actions In asking for his [the plaintiff's] resignation." Id. 1391. Unlike the situation in the case at bar, the interest in Vukadinovich was purely a private one. Throughout Ms. Sturm's employment with the defendant she advocated for students to be moved into the mainstream classroom as well as be placed in the BRACES program. There is nothing in the complaint that would support the conclusion that the catalyst for her outspoken advocacy for her special education students was a purely private concern. See Complaint ¶ 12.

Finally, the defendant contends that the plaintiff was voicing her disagreements in private amongst her fellow teachers and school administrators, thus, her speech is not protected by the First Amendment.[2]  However, there is no requirement that a plaintiff's speech must be made in public in order to trigger First Amendment protection. See Connick v. Myers, 461 U. S. at 146. Not only does the speech not have to be made in public but it also does not have to be frequent. "[L]imited public exposure and infrequent occurrence of the speech does not, however, necessarily render [plaintiff's] statements unprotected." Flynn v. New York City Board of Education, 2002 U.S. Dist. LEXIS 18259, *21-22 (S.D.N.Y. 2002), quoting Fillie-Faboe v. Vocational Education and Extension Board, 2001 U.S. Dist. LEXIS 25381, *19 (E.D.N.Y. 2001).

The defendant emphasized that "what is actually said on that topic must itself be of public concern." See Def. Memo. at 8. The defendant cited Wilson v. City of Littleton, 732 F.2d 765, 769 (10th Cir. 1984), for the proposition that what is actually said must be of public concern rather than of general interest. In Wilson, the plaintiff was fired when he refused to take off a black shroud that he wore across his badge to mourn the death of a policewoman from another town. The Tenth Circuit concluded that, "while the death of a police officer could conceivably be

---

[2] In this section, the defendant briefly discusses the difference between speech being of public interest rather than directed by a private grievance. See Def. Memo. At 9; quoting Bonds v. Milwaukee County, 207 F.3d 969, 980 (7th Cir. 2000). However, the defendant discusses this in more detail in its legal argument section: A(1)(c) which is located at page 11 of its Memorandum of Law in support of its motion to dismiss. To avoid unnecessary repetition, this issue will be addressed in Section A(1)(c).

a topic of general interest to the public under other circumstances, Wilson's [the plaintiff's] personal feeling of grief is not a matter 'of public concern' ...." Id. at 769.  Wilson is not even remotely analogous to the present case where the plaintiff, a special education teacher, was advocating on behalf of her student's rights under the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et. seq.

The Second Circuit's decision in Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir. 1996) crystallizes the issue that is presently before this court.  The Second Circuit held that a teacher's statements "regarding the quality of education provided by the public school as measured by achievement test scores and their year-to-year improvement or deterioration on a school wide basis may reasonably be considered a matter of public concern." Id. at 325.  The Second Circuit reasoned that "these are issues of serious interest to the community and Bernheim should be able to speak freely about them without fear of retaliation." Id.; see also Mazurek v. Wolcott Bd. Of Edu., 849 F. Supp. 154, 157-58 (D. Conn. 1994) (holding a substitute teacher's complaints about school board's policy of calling substitute teachers and hiring the best qualified candidates touched on matters of public concern).

In Jefferies v. Harleston, 21 F. 3d 1238 (2d. Cir), vacated on other grounds, 513 U.S. 996 (1994) the Second Circuit stated that a teacher's speech is protected if it criticizes a public school system's curriculum for reflecting a bias against minorities because "these issues are suffused with social and political hues." Id. at 1245-46.  In Jefferies, the plaintiff, a college professor, claimed that his term was reduced from three years to one year in response to a controversial off- campus speech that he gave.  Id. 1241.  The plaintiff was the keynote speaker at an off-campus symposium on black culture. He spoke predominantly on the bias he perceived in New York State's public school curriculum. Id.  During the speech, the plaintiff "made several derogatory statements, particularly about Jews. The speech ignited a firestorm of controversy." Id.  The Second Circuit concluded that the plaintiff's "speech unquestionably involved public

issues" and "First Amendment protection does not hinge on the palatability of the presentation; it extends to all speech on public matters, no matter how vulgar or misguided." Id. at 1245 - 46.

In Fillie-Faboe v. Vocational Education and Extension Board, 2001 U.S. Dist. LEXIS 25381 (E.D.N.Y. 2001), a teacher criticized the defendant school, the curriculum and teaching methods engaged in by other teachers. Id. at *1. She also expressed concerns about the curriculum and student conduct during faculty meetings. Id. The court found that "[in] view of the presumed pedagogical expertise of [a] teacher, it is reasoned that teachers are in a better position to comment on matters within their professional competence, and should do so without fear of retaliation." Id. at *7. The court denied defendants' motion for summary judgment, reasoning that plaintiff's "comments regarding a higher academic standard, more rigorous curriculum and the quality education at the [school] are precisely the kind of comments Pickering protects." Id. at *8. The court elaborated that plaintiff's comments "outweighed any minimal interference with the efficient education of the students." Id. See also Bowman v. Pulaski County Special Sch. Dist., 723 F.2d 640, 644-45 (8th Cir. 1983) (finding that public speech about the care, education and punishment of school children is a matter of public concern and outweighs other legitimate concerns of government); Fales v. Garst, 235 F.3d 1122, 1124 (8th Cir. 2001) (finding that "speech centered around the care and education of special education students touched upon matters of public concern").

Linda Sturm's speech not only touches on matters of public concern but, like Fillie-Faboe, is "precisely the kind of comments Pickering protects." Fillie-Faboe, 2001 U.S. Dist. LEXIS at *8. Education is an integral part of American society. Special education is the primary vehicle that this society uses to incorporate children with disabilities into the mainstream of the American way of life. Ms. Sturm voiced her concerns regarding the education of many of her students to other faculty members, supervisors and often to parents during a student's Planning and Placement Team ("PPT") meetings. See Complaint ¶ 12-26. For example, the School Psychologist at Rocky Hill, Mr. Ted Dorrington, asked Ms. Sturm if she would be willing

14

to "trade" Jane Doe out of the BRACES program so there would be room for John Doe. Complaint ¶ 24. Ms. Sturm refused his proposal because it would force Jane Doe to be denied the benefit of the BRACES program, which Ms. Sturm felt the child clearly needed and to which she was entitled. Because Ms. Sturm would not agree to the "trade," John Doe was placed in Ms. Sturm's classroom and denied placement into the BRACES program. Complaint ¶ 24.

      b.     **The confidential content of the plaintiff's speech does not preclude her from First Amendment protection.**

The defendant argues that that the plaintiff's speech "could never qualify as 'public concern', at by law it could not be broadcast[ed] to the public." Def. Mem. of Law at 11. The argument not only misconstrues the law but invents First Amendment analysis that presently does not exist. As the Supreme Court clearly articulated in Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979), "protected free speech rights are not lost simply because the speech is communicated privately to the employer rather than to the public." Id. at 415-16; See also, Connick, 461 U.S. at 146.

The only case cited by defendant to support its assertion is Healy v. James, 445 F.2d 1112 (2d. Cir. 1971). In Healy, the plaintiffs, who were college students, filed a lawsuit after the defendant denied their application requesting recognition of their local chapter of a political organization. Id. at 1122. The "preamble" published at the end of the court's opinion sets forth a list of "Statement on Rights, Freedoms and Responsibilities of Students." The rights to which the court was referring to was the protection of students' views, beliefs and political associations. Id. at 1136. The defendant is trying to extract bits and pieces of language from a thirty-four year old opinion to create an argument that does not exist. The Healy decision is inapposite to the facts presented in this case.

Even if Ms. Sturm's speech "is confidential, involving highly private information as to students' behavior, emotional disturbances, and academinic achievements," it does not automatically deem the speech unprotected. See Def. Mem. of Law at 11. Ms. Sturm

advocated on behalf of her students to her employer who would be privy to the students' confidential information, thus rendering defendant's argument moot and not entitled to further discussion.

   c.   **Plaintiff's speech rises to the level of "public concern," rather than as a personal grievance**

   It is well settled that statements concerning merely private matters, such as personal grievances between employer and employee, are not entitled to First Amendment protection. Bernheim v. Litt, 79 F.3d 318, 324 (2d Cir. 1996). The defendant contends that Ms. Sturm's speech should be construed as a personal grievance rather than a matter of public concern. This unsupported assertion is not based on either law or fact. Rather, the foundation for this opinion is merely the defendant's subjective interpretation.

   The defendant's reliance on Roberts v. Van Buren Public Schools, 773 F.2d 949 (8th Cir. 1985); Ballard v. Blount, 581 F. Supp. 160 (N.D. Ga. 1983), and Dixon v. Board of Education of Albuquerque (N.M. 2002) is misplaced. In Roberts, the plaintiffs claimed that their teaching contracts were not renewed in retaliation of the three grievances they filed with the teachers' union. 773 F.2d at 952. The first grievance expressed their dissatisfaction with the manner in which parental complaints concerning seating arrangements for a bus during a school trip had been handled. Id. at 952. The second grievance criticized the school for failing to provide monetary support for the trip. Id. The third grievance pertained to the inadequacy of teaching supplies and need for doing away with Weekly Readers to obtain greater classroom allowances for other supplies. Id. The district court found "that some of the complaints went more to the relationship between (the principal) and the teachers as supervisor and employees rather than to the discharge by (the principal) and the school of their public function of education." Def. Mem. of Law at 12, quoting Roberts, 773 F.2d at 956. (Emphasis omitted). However, the defendant failed to mention the court's discussion that "expenditures of public funds---whether the district should provide support for the educational trip to the state capital; whether teachers

16

should have to use their own money to properly do their jobs; and whether adequate money was available for classroom supplies and how such money should be used" touch on matters of public concern. Id. at 957. Applying the Pickering balance test, the court ultimately decided that the speech was not protected because the "employer has a legitimate interest in achieving compliance with decisions that, while once open to dispute and discussion, have been made through proper channels." Id. The plaintiff's speech was not in response to conduct or decisions as they were occurring, rather, were challenging decisions already determined. Id. For that reason, the court held that the governmental / employers' interest outweighed the employee's interest. Id.

Unlike the present case, the plaintiff in Ballard spoke out concerning matters that were personal to him and were not matters of public concern. The plaintiff objected to: 1) the denial of tenure to a colleague; 2) the manner in which he and other colleagues were assigned to teach English classes; 3) his less-than-average annual salary increases; and 4) a proposed freshman English syllabus which restricted a teacher's latitude in conducting the class. 581 F. Supp. 160, 162 (N.D. Ga. 1983). The plaintiff in Ballard was not advocating for anyone but himself. The court may have reached a different result if his colleague was denied tenure because she was black and he opposed her denial on that basis. However, the plaintiff's grievances were just that, they were "his." In stark contrast, the plaintiff in the present case spoke out concerning the rights of her students with disabilities under the IDEA.

The defendant's assertion that the facts of Dixon "are comparable to those in the present case" is futile. The defendant again plucks quotes from Dixon and tries to parallel facts that are inconsistent. In Dixon, the court concluded that the plaintiff's concerns "were related solely to her ability to function as a principal and in executing her duties …." Id. at 4. When the plaintiff in Dixon was hired as principal she was told about certain financial irregularities and was told it was part of her job to put an end to some of the schools irregular relationships. Id. at 4. According to Dixon, the plaintiff's speech regarding financial irregularities did not rise to the level

of public concern that would warrant constitutional protection. Id. In Dixon, the plaintiff was carrying out the directives of her employer. Id. In the present case, Ms. Sturm was doing more than evaluating and assessing a student's Individualized Education Program. Rather, she was speaking out against the school district's policies and procedures regarding the placement (or lack thereof) of special education students into the BRACES program.

 The case presently before the court is similar to Flynn v. New York City Board of Education, 2002 U.S. Dist. 18259 (S.D.N.Y.) In Flynn, the plaintiff, a special education teacher, was terminated after he voiced his opinion about several issues within the school district. Id. at *20-21. The Court in Flynn comprehensively examined what speech was of public concern, and, therefore, entitled to First Amendment protection and what speech was simply of general interest and not entitled to First Amendment protection. Some examples of the speech that the court found to be "unprotected" included:

- introducing himself as a special education teacher;
- disagreements with the Director's special education criticism of his teaching methods;
- the qualifications of a student in his class for music instruction;
- disciplining school children;
- a disagreement with the Director of special education about whether one of his students was 'settling in well to Family Academy' or should be transferred out.

Id. at 20-21. The court found, however, that other speech involved "clearly matters of public concern." Id. at 21. That speech, which endorses Ms. Sturm's complaint dealt with the plaintiff's complaints that "special education students be dispersed to mainstream homerooms, math and English classes in accordance with the 'least restrictive environment' mandated by federal law and about a student's allegedly cheating on a test without repercussions." Id. These concerns were voiced "primarily at parent conferences, faculty meetings and in conversations with the Libens [Directors]. The court believed that the plaintiff's speech 'on these topics had little to do with his own labor dispute; rather he spoke as an educator regarding requirements of law and alleged cheating on a test.'" Id. at 22.

Ms. Sturm, like the plaintiff in <u>Flynn</u>, was an educator, speaking out regarding requirements of law and the well-being of her students with disabilities and their right under the IDEA to a free and appropriate education.

### d. The plaintiff's speech satisfies the "motive" component of a public concern.

The Rocky Hill Board of Education claims that the plaintiff's speech is "private and personal" and, therefore, not entitled to First Amendment protection.  Def. Mem. of Law at 14, citing <u>Blum v. Schlegel</u>, 18 F.3d 1005, 1012 (2d Cir. 1994).  The court in <u>Blum</u>, however, recognized that "virtually every citizen has a personal interest in matters of public concern; after all, each citizen is a member of the public and is, in some way, impacted by the resolution of societal problems." <u>Id</u>. at 1013.  The court found that "Blum's speech advocating the legalization of marijuana, criticizing national drug control policy, and debating civil disobedience on its face implicates matters of public concern."  However, the Court concluded that the plaintiff was simply "airing his own feelings about drugs and that his motivation for writing the articles was personal." <u>Id</u>.

In the present case, Ms. Sturm was not advocating generally about special education. Rather, she was advocating for disabled children in the Rocky Hill School District who were not receiving an "appropriate education," as they were entitled to under the applicable federal law. In particular, she complained that 1) a male student identified as "high risk" should have been placed in the BRACES program (Complaint ¶ 18); 2) a male student with Pervasive Development Disorder, Deficit Hyperactivity Disorder, Generalized Anxiety Disorder and a phonological processing disorder should not be in "mainstream" but, rather, should have been placed in the BRACES program (Complaint ¶ 16; and 3) a female student with severe emotional problems should be placed in the BRACES program (Complaint ¶ 14).

Ms. Sturm's case is inapposite to <u>Connick</u>.  In <u>Connick</u>, the plaintiff, an assistant district attorney, annoyed by a proposed transfer to different duties, was terminated by the district

attorney after she circulated among her fellow assistants a questionnaire intended to precipitate a "vote of no confidence" in the district attorney and his supervisors. 461 U.S. at 152. The plaintiff in the present case was not trying to benefit herself or "gather ammunition for another round of controversy with her supervisors." Rather, she was just trying to help her disabled students receive the education they needed and to which they were entitled. See Def. Mem. of Law at 15, citing Connick, 461 U.S. at 148.

An educator's voice should not be stifled. The classroom is often the foundation of any local community. What is more important to any community then their children's school? What occurs within the walls of a school district is a matter of concern not only from a legal perspective but from a common sense perspective as well. Parents and the community have a right to know what is going on within their school districts.

In Blum, the case relied on by the defendant, the Second Circuit clearly adopted the Supreme Court's words: "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Blum, 18 F. 3d at 1011, citing Shelton v. Tucker, 364 U.S. 479, 487 (1960).

e.    **Defendant's reliance on Berbas v. Board of Education is misplaced and plaintiff's claims should not be decided upon a motion to dismiss.**

The defendant devotes substantial attention to a Seventh Circuit case the circumstances of which are not even remotely similar to the circumstances in the present case. See Def. Mem. of Law at 16. In Berbas v. Board of Education of the City of Chicago[3], (N.D. Ill 2000), the plaintiff was assigned by the principal to teach special education classes in a small alcove in the school which was not large enough to teach the class. Id. at 1. The plaintiff filed a grievance, requesting that she either be reassigned to another classroom or that the number of students be

---

[3] There is no citation provided to this opinion. The defendant attached a copy of the opinion to its brief.

reduced. Id. at 1.  That same day, the plaintiff was reassigned to teach science to a much larger group of students. Id. at 2. The plaintiff filed suit claiming that she was retaliated against for exercising her rights to associate with the union. Id. The plaintiff alleged that her speech was protected because it involved a matter of public concern  - "namely, the compromised health and safety of public school students resulting from overcrowded and inadequate classroom facilities." Id. at 3.

In applying the Pickering analysis, the Berbas court looked at the "entire record," in general, and scrutinized the actual language in the grievance, in particular.  According to the grievance, assigning the plaintiff to teach in the alcove was "not conducive to the safe and healthy environment that she [was] entitled to as a Board of Education employee under the current Agreement." Id. at 4.  The court found that the plaintiff's "grievance demonstrates it was not filed to raise awareness of matters of public concern but instead to vindicate her private rights under a collective bargaining agreement." Id.  The plaintiff in Berbas did not address the safety and health of her students, which the court stated "can certainly be a matter of public concern," until she filed her complaint. Id.   The plaintiff's grievance which she claimed contained the protected speech failed to even mention her students' welfare.

In Cliff v. Board of School Commissioners of the City of Indianapolis, 42 F.3d 403, 411 (7th Cir. 1995), cited by Berbas and relied on by the Rocky Hill Board of Education, is equally misplaced.  In Cliff, the court recognized that the plaintiff "complained only in response to criticism directed at her classroom performance," and the complaints were "therefore on her own behalf and in her own interest." Berbas, quoting Cliff, 42 F.3d at 411-12.

In the present case, Ms. Sturm continuously complained about the needs of her special education students.  There was no hidden agenda masked under her genuine concerns about the students with disabilities.  Just because the plaintiff's statements were to co-educators and supervisors does not automatically render her statements "private" and not entitled to First Amendment protection. See Givhan v. Western Line Consolidated School District, 439 U.S.

21

410, 415-16 (1979), ("protected free speech rights are not lost simply because the speech is communicated privately to the employer rather than to the public.").

> **f.    The plaintiff has asserted a claim against the defendant based on the standard set forth by Monell v. Department of Social Services.**

In Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986), the United States Supreme Court stated, "Monell is a case about responsibility." In Monell v. Dep't of Soc. Services, 436 U.S. 658 (1978), the Court overruled Monroe v. Pape, 365 U.S. 167 (1961), insofar as it immunized municipalities from liability under §1983. Monell at 663. Monell noted that "Congress not only has shown no hostility to federal-court decisions against school boards, but it has indeed rejected efforts to strip the federal courts of jurisdiction over school boards." Id. at 696. The Court in Monell clearly stated that liability cannot attach to a municipality from the theory of respondeat superior. Id. at 691. Rather, "a municipality entity may be liable … only if the alleged constitutional violation was caused by the entity's 'policy or custom.'" Mandell v. The County of Suffolk, 316 F.3ds 368, 385 (2d. Cir. 2003). In doing so, the Monell Court intended to distinguish between the acts of municipality employees and the municipality's actual policies of the municipality. Id. To further guarantee that responsibility falls squarely with the appropriate culprit, the Supreme Court went a step further and held that a municipality may be liable even in the absence of a broader policy if the "challenged action is directed by an official with 'final policymaking authority.'" Id.

In Monell, a class of female employees brought suit against both the Department of Social Services and the Board of Education of the City of New York challenging a policy maintained by both entities that "compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." 436 U.S. at 661. The Court held that the defendants were not immune to liability because the entities' policy was the catalyst for alleged constitutional violation. Id. at 700.

In <u>Mandell</u>, the plaintiff, a former deputy police inspector, sued the County and the police commissioner alleging, among other things, religious discrimination and retaliation in violation of the First Amendment. 316 F.3d at 373. The Second Circuit stated that, "plaintiff challenges as retaliatory employment decisions made by Gallagher, who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies. Gallagher's position provides a sufficient basis for holding the County liable for his adverse decisions with respect to the plaintiff." <u>Id</u>. at 384.

In <u>Dangler v. New York City Off Track Betting</u>, 193 F.3d 130, 135 (2d. Cir. 1999), the plaintiff, a high level executive at New York City Off Track Betting ("OTB"), was allegedly retaliated against for reporting illegal activities by upper management to the OTB Inspector General. The Court held that "the complaint … plainly alleged sufficient facts to permit the inference that the employment decisions adverse to [the plaintiff] were the responsibility of OTB." <u>Id</u>. at 143. The Second Circuit cited several reasons for its holding: (1) The retaliation against the plaintiff was led by OTB's President, General Manager and the chairman of OTB's board; (2) OTB's director of personnel and general counsel attended a meeting during which OTB's President demanded that the plaintiff retire; (3) OTB's President's memorandum to the plaintiff stated that "the corporation had asked [the plaintiff] to sign a waiver absolving OTB of any liability"; and (4) the plaintiff's termination had been discussed and approved by the OTB's Board of Directors. <u>Id</u>. at 143.

In the present case, the crux of the defendant's claim that Ms. Sturm has "failed to assert a <u>Monell</u>-style claim" rests on the misplaced assertion that Ms. Sturm did not "specifically identif[y] the superintendent of Rocky Hill as being involved in the decision to not renew her contract." See Def. Mem. of Law at 18-19. Ironically, the defendant then admits that the "final decision-making authority over a teacher's employment resides in the office of superintendent." See Def. Mem. of Law at 18. Ms. Marino, as the Principal of Rocky Hill School District, could not unilaterally decide not to renew Ms. Sturm's contract. Rather, she needed and received the

support of the Superintendent, Dr. Camille Vautour.  Dr. Vautour was present during a meeting in March 2002 with Ms. Sturm, Ms. Marino and Union Representative, Ms. Crawford, where it was decided that Ms. Sturm could work from home as a result of the severe depression that she suffered due to her imminent termination.  See Complaint ¶ 30.

In <u>Pembaur</u>, the Supreme Court held that "[i]n each case municipal liability attached to a single decision to take unlawful action made by municipal policymakers. We hold that municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." <u>Id.</u> at 483.  The Rocky Hill Board of Education, through its Superintendent, made the decision not to renew Ms. Sturm's employment contract.  For purposes of a 12(b)(6) motion, it is not clear "beyond a doubt" that Rocky Hill's Superintendent did not have the policymaking authority required by <u>Monell</u>, to impose liability upon Rocky Hill Board of Education.

   2.  **Plaintiff has properly alleged a violation of the First Amendment and the corresponding provisions of the Connecticut State Constitution, pursuant to C.G.S. 31-51q**

The defendant contends that "Connecticut courts have adopted have adopted the <u>Connick v. Meyers</u> analysis, and the standard of review for First Amendment retaliation claims brought under § 1983, upon their review of corresponding claims brought under §31-51q." See Def. Mem. of Law at 19.  According to the defendant, since a §31-51q claim is analogous to a §1983 claim, no further inquiry is warranted.  However, in <u>Sierra v. State of Connecticut</u>, Superior Court, Judicial District of Hartford, docket no. CV 00-0803588 (June 4, 2001, Beach, J.), which was relied on by the defendant and attached to its brief, the court stated that "[a]lthough it is indeed true that review of federal authorities regarding actions brought pursuant to 42 U.S.C. § 1983 ... can be 'instructive' in the analysis of action brought pursuant to § 31-51q ... because the actions are analogous; the two causes of action are distinct vehicles." <u>See also</u> <u>Spoczak v. Meriden Board of Education</u>, Sup. Ct. J.D. of New Haven, Docket No. 419547

(October 6, 2000, Levin, J.)(Also relied on by the defendant and annexed to its memorandum of law).

In both a §1983 action and a §31-51q action courts must ask whether the speech is a matter of public concern. However, "there is no compelling reason why the pleading elements and procedures must be identical." <u>Sierra</u>, Sup. Ct. J.D. of Hartford, Docket No. CV 00-0803588 (June 4, 2001, Beach, J.)(annexed to the Defendant's Mem. of Law). In <u>Daley v. Aetna Life & Casualty Co</u>., 249 Conn. 766 (1999), the Connecticut Supreme Court held that although the issue of whether the subject matter is of public concern is a matter of law for the courts to decide, the question as to whether the statement was intended to address a public concern or a private grievance is a factual issue for the jury to decide. <u>Id</u>. at 782. In <u>Daley</u>, the plaintiff alleged that she was terminated as a result of a critical memorandum that she drafted. <u>Id</u>. at 773. After the plaintiff's request to work from home one day a week was denied, she sent an inter-office memorandum to Aetna's chairperson that criticized the defendant's highly publicized "family friendly" workplace policies. <u>Id.</u> at 773. The court concluded that the plaintiff "bears the burden of establishing that she was motivated to champion the rights of others, rather than to air her own personal grievance with Aetna management. Whether she met that burden involves a question of fact to be resolved by the jury." <u>Id</u>. at 784.

Ms. Sturm advocated on behalf of the defendant school district's students with disabilities and contended that their rights under the IDEA were being violated. As discussed at Section A(1)(a-e), and incorporated into this section, the plaintiff's speech is a matter of public concern. Whether plaintiff's speech was intended as a matter of public concern or a private grievance, under §31-51q, is a matter of fact for the jury to decide and not to be considered by the Court as a matter of law.

B. **THE PLAINTIFF DOES NOT HAVE TO BE A PERSON WITH A DISABILITY IN ORDER TO ALLEGE A RETALIATION CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT**

The defendant contends that in order to state a claim under Section 504 of the Rehabilitation Act the "plaintiff must first allege she has a disability." See Def. Mem. of Law at 20. The defendant is incorrect. A plaintiff does not have to allege a disability in order to be protected against unlawful retaliation under Section 504 of the Rehabilitation Act.

It is well settled that the standards applied to employment discrimination actions under the Americans with Disabilities Act ("ADA"), 42 USCS § 12101 et. seq., were intended by Congress to also apply to the Federal Rehabilitation Act, 29 USCS § 794. Francis v. City of Meriden, 129 F.3d 281, 285 n.4 (2d Cir. 1997); Shellenberger v. Summit Bancorp, 318 F.3d 183, 188 (3d. Cir. 2003). The text of the Rehabilitation Act is clear that Congress created a cause of action for retaliation that was not limited to persons with "disabilities" as defined by the statute. Specifically, the Rehabilitation Act incorporates the standards of the ADA. Section 503 of the ADA specifically prohibits retaliation. 42 U.S.C. §12203(a). According to this defendant, in Weixel v. Board of Education of City of New York, 287 F.3d 138 (2d Cir. 2000), the Second Circuit held that "[i]n order to state either a claim of discrimination or retaliation under Section 504, a plaintiff must first prove that she has a disability, as defined by Section 504 of the Rehabilitation Act." Def. Memo of Law at 20. Weixel did say that a person alleging disability discrimination must prove she has a "disability" as defined by Section 504. Id. at 197. However, Weixel never said that the individual alleging retaliation under Section 504 must also meet the statute's definition of disability. Id. at 148-49.

In fact, had Weixel reached the decision which this defendant claimed it did, it would have had to override its previous decision in Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155 (2d Cir. 1999). In Sarno, the Second Circuit rejected the defendant's argument that the plaintiff must be a person with a "disability" to pursue a retaliation claim under the ADA. Sarno, 183 F.3d at 159. Sarno explained that all that is needed is "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. Id.

In <u>Shellenberger v. Summit Bancorp</u>, 318 F.3d 183, 188 (3d. Cir. 2003), the plaintiff repeatedly asked the defendant for accommodations relating to her "perfume sensitivity." <u>Id</u>. at 184 <u>citing</u> <u>Krouse v. American Sterilizer Company</u>, 126 F.3d 494, 498 (3d. Cir. 1997). The defendant, relying on the conclusion that the plaintiff's perfume sensitivity was not a disability within the meaning of the ADA, terminated the plaintiff's employment reasoning that she was insubordinate. <u>Id</u>. at 186. The court held, that "failure to establish that she was disabled does not prevent her from recovering if she can establish that her employer terminated her because she engaged in activity protected under the ADA." <u>Id</u>. at 188. Similarly, a plaintiff does not have to be a "person with a disability" under the Rehabilitation Act to invoke its retaliatory protection.

The elements of a retaliation claim under Section 504 are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." <u>Weixel v. Board of Education of City of New York</u>, 287 F. 3d 138, 148-149 (2d. Cir. 2002). The elements of a retaliation claim under Section 504 fail to include any requirement that the plaintiff must first be a person with a disability.

Ms. Sturm alleges in her complaint that she was engaged in a protected activity, i.e., advocating on behalf of her disabled students whose rights were being violated. Complaint ¶ 14-25. Ms. Sturm made the defendant aware of her complaints. As a result, Ms. Sturm's employment contract was not renewed. Complaint ¶ 29. Ms. Sturm's opposition to the violations of her students' rights under federal law was the reason for her termination. Ms. Sturm was told by the school's principal that she was not a "good fit." Complaint ¶ 29.

The plaintiff has properly stated a retaliation claim under Section 504 of the Rehabilitation Act.

C.    **DEFAMATION**

1.    <u>The defendant is not protected by governmental immunity</u>

27

The defendant's blanket assertion that it is shielded from liability just because Rocky Hill Board of Education is a municipal entity is incorrect. See Def. Mem. of Law at 21. Although municipal entities may not be held liable for the intentional torts of its employees, the legislature has abrogated the general rule and allowed liability where the conduct constitutes "criminal conduct, fraud, actual malice or willful misconduct." See C.G.S. §52-557n(a)(2)(A).

In this case, both Carey Miller and Ruth Young, on behalf of the defendant, made defamatory statements about Ms. Sturm with actual malice when they said that Rocky Hill Board of Education would not rehire Ms. Sturm. Complaint ¶ 48-49.

2.    Actual Malice

It is well settled that a public official is precluded from recovering damages for defamation unless he or she proves that the defamatory statement was made with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false.

The defendant's reliance on Hollman v. Baldwin Union Free School District[4], 320 F. 3d 164 (2d. Cir. 2003) is misplaced. In Peters v. Baldwin, 320 F. 3d 164 (2d. Cir. 2003), the communications that gave rise to a qualified privilege claim was communications made between two employees about another employee within the school district. It is easy to understand how the Peters court found that because "Hollman (Principal) is an official of Baldwin, he had a qualified privilege to 'make a bona fide communication upon a subject in which he [had] an interest, or a legal, moral, or social duty to speak, [where] the communication [was] made to a – person having a corresponding interest or duty.'" Id. at 169. In Peters, the principal told the superintendent that the plaintiff was suicidal. In the present case, Ms. Miller and Ms. Young shared information regarding Ms. Sturm to Mr. Russo, a prospective employer. Unlike the

---

[4] Defendant improperly cited the case. The proper case name is Peters v. Baldwin, 320 F. 3d 164 (2d. Cir. 2003). In responding to the defendant's arguments relating to this case, the plaintiff will refer to it by its proper case name.

defendants in <u>Peters</u>, Mr. Russo did not work with or for Ms. Miller or Ms. Young.  Ms. Miller and Ms. Young's statements were not in furtherance of any "interest or duty."  Rather, they were blanket statements communicating negative made with complete disregard for its truth and were intended to retaliate against Ms. Sturm because she spoke out on behalf of the students with disabilities.

The plaintiff has sufficiently pled a defamation claim and the defendant is not entitled to a motion to dismiss.

**D.    THE PLAINTIFF HAS PROPERLY STATED A CLAIM FOR FALSE LIGHT – INVASION OF PRIVACY**

The Connecticut Supreme Court has recognized that a cause of action may lie for an invasion of privacy based on "(a) publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation; and (b) publicity which places the plaintiff in a false light in the public eye." <u>Honan v. Dimyan</u>, 52 Conn. App. 123, 132 (1999) <u>quoting</u> <u>Venturi v. Savitt, Inc</u>., 191 Conn. 588 (1983).

1.    <u>The plaintiff has alleged the necessary elements of "publication."</u>

To satisfy the element of "publicity," the plaintiff must show that the matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge, thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." <u>Nolfi v. Melson</u>, 2000 Conn. Super LEXIS 1521, *7 (2000).

The defendant claims that Ms. Sturm has failed to allege that the "subject statements were communicated to the public at large." See Def. Mem. of Law at 27.  Ms. Sturm, as a Special Education teacher, works in a small industry.  Her reputation is paramount to her career as a special education teacher.  It is "substantially certain" that only one communication, in this case, was sufficient enough to notify the public at large that Ms. Sturm's employment contract

was not renewed.   Further discovery is necessary in order to establish the actual amount of people that the subject statements were communicated to.  The plaintiff has pleaded sufficient facts to survive a 12(b)(6) motion to dismiss.

      2.    <u>The defendant is not protected by the defense of governmental immunity</u>.

    The defendant reiterates its assertion that it is immune from liability just because it is a municipality.  See Def. Mem. of Law at 28.  The defendant refers the court to its legal section arguing in favor of governmental immunity in response to plaintiff's defamation claim.  The plaintiff reiterates her argument that a municipality can be held liable where the conduct constitutes "criminal conduct, fraud, actual malice or willful misconduct."  See C.G.S. §52-557n(a)(2)(A).  The plaintiff further maintains that the defendant acted with malice when communicating with Ms. Sturm's prospective employer, Mr. Russo.  <u>See</u> Section III (C)(2) of Plaintiff's Memorandum of Law.

**E.     <u>PLAINTIFF IS NOT BRINGING A CLAIM UNDER C.G.S. §31-128f</u>**

    The defendant argues that Ms. Sturm cannot assert a claim under §31-128f because (1) the statute does not protect public employees; and (2) the plaintiff does not set forth what "individually identifiable information" was disclosed from her personnel file.  See Def. Mem. at Law at 28-29.  However, the plaintiff has not filed a claim under the statute.  The plaintiff, in her Fourth Count, alleges a cause of action for Defamation and False Light Invasion of Privacy.  Ms. Sturm's allegations are based on the defendant's disclosure to a prospective employer that Rocky Hill School District would not rehire Ms. Sturm which resulted in her failure to get the job.  Complaint ¶48-49.  C.G.S. 31-128f is only cited by the plaintiff to reflect Connecticut's public policy against disclosure of an employee's personnel file and the necessity to limit information given to outside individuals.  Because the plaintiff has not filed a cause of action under §31-128f, there is nothing for the court to dismiss.

**F.     <u>THE PLAINTIFF HAS SUFFICIENTLY STATED A CLAIM FOR WRONGFUL DISCHARGE</u>**

The Connecticut Supreme Court has carved out an exception to the traditional rules governing employment at will "so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 474 (1980).

According to the defendant, "the plaintiff must point to some specifically defined public policy, as invoked and embodied in statute." See Def. Mem. of Law at 30. The defendant, citing Morris v. Hartford Courant Co., 200 Conn. 676, 679 (1986), only cites a portion of the courts analysis. The Connecticut courts have struggled to "define precisely the contours" of the public policy exception. Id. at 680. According to Morris and, more recently, in Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 699 (2002), the Connecticut Supreme Court stated that when attempting to define the contours of the public policy exception "we look to see whether the plaintiff has … alleged that his discharge violated any explicit statutory or constitutional provision … **or** whether he alleged that his dismissal contravened any judicially conceived notion of public policy…." (Emphasis added).

The defendant contends that "the plaintiff has failed to identify a specific public policy, as enumerated by statute, in her complaint." See Def. Mem. of Law at 31. The plaintiff, however, specifically alleges that the defendant violated the Individual with Disabilities Act, 20 U.S.C. § 1400, et. seq[5]. See Complaint ¶13. In fact, the defendant conceded that the "plaintiff's Fifth Count (alleging wrongful discharge) incorporates by reference those allegations set forth in ¶¶ 1-34 of her complaint." See Def. Mem. of Law at 31.

The defendant next argues that "the plaintiff may not cite to 20 U.S.C. § 1400 et. seq., in support of her wrongful discharge claim." See Def. Mem. of Law at 32. The defendant argues that "[c]ourts have ruled that in order to rely on such a statute in support of a common law action

---

[5] In Faulkner v. United Technologies Corp., 240 Conn. 576, 578 (1997), the Connecticut Supreme Court held that a wrongful discharge claim could be predicated solely on a violation of a federal statute. Faulkner went even further and concluded that it is not necessary for the plaintiff to allege an explicit connection between the federal statute and the policy of the state. Id. at 585.

for wrongful termination, an 'employee must be a member of the class of persons that the specified public policy was designed to protect.'" See Def. Mem. of Law at 32; citing <u>Dray v. New Market Poultry Prods., Inc.</u>, 258 Va. 187, 191-92 (1999). In fact, what the defendant really means is that Virginia courts have said that, under Virginia common law, an employee must be in the class of persons that statute was designed to protect. However, the defendant does not show why Connecticut courts interpreting Connecticut common law would reach the same conclusion.[6]

The defendant also assumes that a plaintiff in Connecticut must point to a state statute to invoke the public policy exception. However, in <u>Sheets</u> stated, "we need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy." 179 Conn. at 480. The cases following <u>Sheet</u> recognized that the public policy exception can be found in "any judicially conceived notion of public policy." <u>Thibodeau</u>, 260 Conn. at 699.

The Connecticut Supreme Court in <u>Sheets</u> reasoned that, "it would be difficult to maintain that the right to discharge an employee hired at will is so fundamentally different from other contract rights that its exercise is never subject to judicial scrutiny regardless of how outrageous, how violative of public policy, the employer's conduct may be." 179 Conn. at 476.

Education is fundamental to American society. Ms. Sturm was the voice for many students with disabilities who neither understood nor knew that their fundamental rights to a free appropriate education were being violated. The plaintiff's complaint is replete with instances where she vigorously advocated on behalf of her disabled students whose rights were being violated under the Individuals with Disabilities Education Act. For example:

- Ms. Sturm advocated for the placement of a female student into the BRACES program to deal with the student's severe emotional problems (Complaint ¶14);

---

[6] A quick review of "Shepard's" citation reveals that no court has ever followed <u>Dray</u> other than those courts that have examined Virginia's wrongful discharge common law.

- Ms. Sturm advocated that a male student with strong organizational and academic needs be placed into the BRACES program (Complaint ¶15);

- Ms. Sturm advocated on behalf of a male student identified with Pervasive Developmental Disorder, Attention Deficit Hyperactivity Disorder, Generalized Anxiety Disorder and phonological processing disorder that he be placed in the BRACES program (Complaint ¶16);

- Ms. Sturm recommended that a male student identified as "high risk" be placed in the BRACES program (Complaint ¶ 18);

- Ms. Sturm opposed the placement of a male student who suffered from School Phobia into the mainstream setting and advocated that he be placed into the BRACES program (Complaint ¶20).

Even if the Connecticut courts decide to follow Virginia's holding in <u>Dray</u> by reasoning that Ms. Sturm cannot rely on the IDEA because it only protects students and not educators, the court could find that advocating on behalf of disabled children is a "judicially conceived notion of public policy."

    1.   <u>This Court has pendent jurisdiction over the plaintiff's common law claim of wrongful discharge.</u>

The defendant claims that "the plaintiff may not bring an action for wrongful discharge, as created by Connecticut common law, in federal court." See Def. Mem. of Law at 33. The defendant relies on a sixteen year old decision that was decided only eight years after Connecticut adopted the public policy exception to the at will employment doctrine. See <u>Koehler v. Chesebrough-Ponds Inc.</u>, 705 F. Supp. 721, 724 (D.Conn. 1988)("Whether Connecticut law would recognize a public policy discharge claim based on a violation of Conn. Gen. Stat. § 46a-80(a) is a matter more appropriately left for decision by the state courts."). It is well settled that Courts have discretion to hear state law claims. (Under 28 U.S.C. § 1367(c)(3), "the district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

In <u>Cates v. State of Connecticut</u>, 2000 U.S. Dist. LEXIS 21110 (D. Conn. 2000), the defendants argued that the court should decline to decide the plaintiff's state law claim for intentional infliction of emotional distress due to the "unsettled nature of the law in this area." <u>Id.</u> at *47 (relying on <u>Koehler</u>, 705 F. Supp. at 724-25).  <u>Cates</u> concluded, however, that "because the court has subject matter jurisdiction over the plaintiff's Title VII and 1983 claims, and because the surviving state law claims arise from the same nucleus of operative facts, the court, in its discretion, will retain jurisdiction over the remaining state law claims in the interests of judicial economy." <u>Id.</u> at *48.

This court should not rely on <u>Koehler</u>, decided over a decade ago, to determine whether pendent jurisdiction is proper.

## V.    **CONCLUSION**

For all the foregoing reasons, the plaintiff requests that the court deny the defendant's motion to dismiss in its entirety.

THE PLAINTIFF,

LINDA STURM

By _____
Gary Phelan (CT 03670)
Tammy Marzigliano (CT 23326)
Gary Phelan, L.L.C.
433 South Main Street, Suite 117
West Hartford, CT  06110
(860) 313-5005

34

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed, first-class, postage prepaid, on April 2, 2004 to:

Eric D. Eddy, Esq.
Michael J. Rose, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

Gary Phelan