UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

LINDA STURM                          :        NO.:  3:03CV0666 (AWT)

v.                                   :

ROCKY HILL BOARD OF EDUCATION        :        APRIL 26, 2004

### DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

**I.     THE PLAINTIFF HAS FAILED TO BRING A FIRST AMENDMENT CLAIM PURSUANT TO 42 U.S.C. § 1983.**

In opposition to the defendant's, Rocky Hill Board of Education, Rule 12(b)6 motion to dismiss, the plaintiff argues that both the content and context of her speech qualifies as 'public concern', and therefore merits protection under the First Amendment.  In essence, the plaintiff's First Amendment claim consists of two general arguments:

1.     That the plaintiff's speech concerned matters of education, and therefore the content of that speech qualifies as a 'public concern'; and

2.     That the plaintiff was "advocating" on behalf of a special education program known as BRACES, and therefore the context of her speech merits First Amendment protection.

ORAL ARGUMENT IS REQUESTED

Both arguments present a very superficial form of First Amendment analysis. The plaintiff's analysis neglects to take into account the *SPECIFIC* content of her alleged speech, and the *SPECIFIC* context within which that speech was presented. The plaintiff's complaint contains a detailed, fact-specific account of the alleged speech, including a specific description of the content of that speech, and the context within which it occurred. The plaintiff alleges 14 instances of speech in support of her claim. The content and context of this speech is as follows:

- The plaintiff recommended a female student for placement in the BRACES[1] program. (¶14 of the plaintiff's complaint);

- The plaintiff recommended male student with 'organizational needs' for placement in the BRACES program. (¶ 15 of complaint);

- The plaintiff recommended a student with Pervasive Developmental Disorder (PDD) and with Attention Deficit Hyperactivity Disorder (ADHD) be placed into BRACES. (¶ 16 of complaint);

- The plaintiff recommended a male student with behavioral problems for placement in the BRACES program. (¶ 17 of complaint);

- The plaintiff recommended another male student, identified as being "high risk", for placement in the BRACES program. (¶ 18 of complaint);

---

[1] The BRACES (Behavior, Rewards, Achievement, Consequences, Encouragement and Support) program was instituted by the defendant for students identified as needing a highly structured program that incorporates clear behavioral expectations. The goals of BRACES were to increase on-task behaviors, cooperativeness, and hands-off behavior, while decreasing disrespectfulness, inappropriate language, and refusal to do work. This program existed in ADDITION to the defendant's special education program. Another educator, Nancy Love, was assigned as the program coordinator for BRACES. (see plaintiff's complaint, ¶ 10).

- The plaintiff recommended a male student with severe anger and emotional issues for placement in the BRACES program. (¶ 19 of complaint);

- The plaintiff recommended that a male student with 'school phobia' be placed in BRACES after he had been placed in her own special education class. The principal, Ms. Marino, removed this student from the plaintiff's class, and placed him an a "mainstream setting."[2]  This student was eventually removed from the school to a clinical school setting.  (¶ 20 of complaint);

- The plaintiff recommended that a male student, suffering from ADHD, Passive Oppositionality, severe anger and self-control issues, and a learning disability, be placed in BRACES.  The school psychologist, Ted Dorrington, denied this recommendation. (¶ 21 of complaint);

- The plaintiff recommended that a student, identified as Jane Doe, be placed in a "mainstream" reading class.  She also recommended that this student be placed in BRACES due to her refusal to do school work and other 'behavioral issues.'  The plaintiff also voiced this recommendation at the student's PPT.[3] (¶ 22 of the complaint);

- The plaintiff was involved in a meeting in November 2001 with the principal, Ms. Marino, the school psychology intern, Debora Levine, the school psychologist, Ted Dorrington, the guidance counselor, Dolores Callagher, and Ms. Love, the BRACES program coordinator.  This meeting was held concerning Jane Doe's placement in certain classes and programs. Ms. Love wished to move Jane Doe out of a BRACES program and into a social studies class. Ms. Marino and Ms. Love also discussed the plaintiff's recommendation, and accused the plaintiff of going behind their backs at Jane Doe's PPT. (¶ 23 of complaint);

---

[2] "Mainstream" refers to those academic classes, outside of the special education program.

[3] 'Planning and Placement Team' meeting.  This is a private, individualized meeting, held between a student's teachers and family members. (see plaintiff's complaint, ¶ 22).

- Also in November of 2001, the school psychologist, Mr. Dorrington, approached the plaintiff regarding one of her students, John Doe. Mr. Dorrington wished to place John Doe in a BRACES program, and suggested that the plaintiff make a 'trade', removing Jane Doe from a BRACES program, in order to make room for John Doe. The plaintiff did not agree to the trade. John Doe was later placed in the plaintiff's special education class, and was denied placement in BRACES. (¶ 24 of complaint);

- The plaintiff met with Ms. Marino concerning four female students in her class. The plaintiff complained that these students presented a behavior problem, and asked that they be separated. (¶25 of plaintiff's complaint);

- The plaintiff also met with the academic teachers within the sixth grade, and with the school guidance counselor, Ms. Broeckel, concerning these same four female students and their behavioral/disciplinary problems. Her request was denied. (¶25 of complaint); and

- The plaintiff was involved in a meeting with the principal, Ms. Marino, and with the director of pupil services, Ms. Young in January 2002. The plaintiff alleges that both Ms. Young and Ms. Marino questioned her behavior at a student's PPT, accusing her of being "sneaky". The plaintiff also alleges that her performance as a teacher was questioned at this meeting. Specifically she alleges that Ms. Marino accused her of failing in her obligation to educate two students, and failure to document her whereabouts, when not attending PPT meetings. (¶26 of complaint).

All of the above 14 instances occurred in either one of three private settings: (1) discussion/debate between the plaintiff and a co-educator(s); (2) a private meeting between the plaintiff, the principal, Ms. Marino, and one or more other co-educators; and (3) within the confines of a student's private PPT meeting. In 11 of the 14 instances, the plaintiff's speech involved her recommendation for a student's

placement into BRACES. In some instances, this recommendation was either opposed or denied by a co-educator. Two instances involved a student disciplinary issue, and the plaintiff's request that four female students be separated. The last instance involved a private meeting, during which the plaintiff's performance as a teacher was questioned by the principal and by the director of pupil services.

The plaintiff's arguments neglect to address the specific details of the aforementioned allegations. Rather, the plaintiff makes broad generalizations. It is not enough for the plaintiff to argue that her speech touched upon matters of education, and therefore such speech automatically became a 'public concern'. And it is not enough for the plaintiff to argue that the context of her speech was in the form of 'advocacy', and therefore a 'public concern, even though such speech was admittedly not intended for a public forum. The plaintiff's arguments do not properly follow the method of analysis, as laid out by the Supreme Court in Connick v. Myers, 461 U.S. 138 (1983), and the defendant asks that this Court dismiss the plaintiff's First Amendment claim in its entirety.

### A.    According To Connick v. Myers, The Context Of The Plaintiff's Speech Does Not Rise To The Level Of 'Public Concern'.

Connick v. Myers, 461 U.S. 138 (1983), and its progeny dictate that a First Amendment analysis must include an examination of both the content and context of the alleged speech. Each of the two factors is equally important in this analysis. Any examination of context, inevitably must address the audience to which the plaintiff's speech is intended. In the present matter, the plaintiff's speech, as alleged in her complaint, was in each instance voiced within the private settings of either (1) private discussions/debates with co-educator(s); (2) private meetings with her principal and one or more co-educators; or (3) within the confines of Planning and Placement Team

('PPT') meetings, confidentially held between a student's teachers and parents. (see Plaintiff's complaint, ¶¶ 14-26, and pages 3-6 of the plaintiff's Opposition brief). Thus, the setting of the plaintiff's speech was entirely private and confidential.

The plaintiff, citing to the decision in Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979), argues that the content of the plaintiff's speech was concerned with education, that education always constitutes a matter of 'public concern', and therefore the fact that the plaintiff's speech was not intended for a public audience has no bearing on her First Amendment claim. The plaintiff misconstrues the import of Givhan. "While it is true that speech need not be made in a public forum to qualify as 'public concern' speech… Givhan does not make either the non-public nature of speech or the identity of the audience to which it is directed irrelevant to a private interest/public concern analysis. If it did, all speech by public employees touching on controversial issues, regardless of context, would automatically be speech of 'public concern.' As we acknowledged in Lewis, that is not the case." Pappas v. Giuliani, 290 F.3d 143, 154 (2nd. Cir. 2002).

In the present case, the plaintiff would have the Court embrace a rule by which any speech, regardless of the manner in which it is voiced, that concerns education, automatically qualifies as 'public concern'. The results of such a rule would be legally impractical. An educator's employment necessitates discussion of education on a day-to-day basis. The plaintiff's rule subjects all of this speech to First Amendment protection. As stated in Givhan, and as dictated by Connick, an examination of the speech's context is necessary in order to "pare down" and ascertain which speech truly merits First Amendment protection. An analysis of both the context and content of the plaintiff's speech is necessary to any correct analysis of the present matter.

**B.**    **The Plaintiff's Speech Was Merely Part Of The Daily, Internal Operation Of A Public School System.**

The plaintiff attempts to cloak her speech with the guise of 'public concern' by labeling it as "advocacy". Throughout the body of her complaint, and the body of her opposition brief, the plaintiff describes her speech as "advocacy" on behalf of her students. However, First Amendment analysis, as dictated by <u>Connick</u>, does not end with an examination of a mere label. Again, <u>Connick</u> dictates that the specific content and context of the speech must be examined.

The content of most of the plaintiff's speech, with the exception of her January 2002 meeting and the requested separation of four female students, involved placement of her students into and out of certain programs offered by the school. All of this speech occurred between the plaintiff and the plaintiff's co-educators. All of the plaintiff's alleged speech documents instances of disagreement between the plaintiff and her co-educators over the placement of certain students into the BRACES program, the plaintiff's special education classes, or the school's mainstream classes. Internal debate over student placement occurs on a day-to-day basis within the administration of a school system and amongst educators. As recognized in <u>Givhan</u> and <u>Pappas</u>, such day-to-day speech does not constitute First Amendment speech. If this were so, a school district would be exposed to suit each and every time a disagreement arose over a student's placement into or out of an educational class/program. Again, this is why <u>Connick</u> calls for an examination of the context of the alleged speech.

Most of these instances of 'advocacy' occurred within the setting of either private conversations/meetings with the principal and other co-educators, or within a student's private, individualized PPT meeting. The very concept of advocacy

inherently involves some sort of public outcry; a pleading on behalf of another's cause before the public at large. The plaintiff in the present matter was merely voicing her disagreement over a particular students' placement, within the context of an internal dispute amongst her co-educators.

The plaintiff also makes the blank assertion in her opposition brief that she was speaking out against school policies. However, she does not specifically identify any policy within her complaint or in her opposition memorandum. The plaintiff merely alleges a series of specific, individual instances where she disagreed over a student's placement. In fact, the only policy, which the plaintiff references in her brief and in her complaint, is the principal's, Ms. Marino, "co-teaching" model, whereby special education teachers conducted classes with "mainstream" teachers. (¶ 9 of complaint, page 2 of opposition brief). The plaintiff admits that this policy was consistent with the objective of IDEA (Individual with Disabilities Education Act), of integrating special education students into a regular education setting. (¶ 13 of complaint, page 2 of opposition brief).

Federal courts have been traditionally reluctant to intervene in conflicts that arise in the daily operation of the public schools. Only where those conflicts "directly and sharply implicate basic constitutional values is intervention warranted." Aebisher v. Ryan, 622 F.2d 651 (2nd Cir. 1980) (attached). The plaintiff's speech in the present matter was likewise merely part of the daily operation of the school. She was not acting as an "advocate", nor was she accusing the school of following a questionable policy/practice. The purpose behind the plaintiff's speech was not to challenge a policy/practice, implemented by the defendant board of education. She was not challenging the school's general, overall treatment of its students. The plaintiff was merely engaged in debate over the placement of certain, particular students. Such debate over student placement is a daily characteristic of a school system's internal

administration. "Following the Supreme Court's distinction in *Connick* between subjects of private and public interest, courts have found speech that concerns internal administration of the educational system… will not receive constitutional protection." Maples v. Martin, 858 F.2d 1546, 1552 (11th Cir. 1988). Despite its characterization as "advocacy", the context and content of the plaintiff's speech does not rise to the level of 'public concern'.

## C.   The Very Content Of The Plaintiff's Speech Dictates That It Could Never Constitute A Public Concern.

The plaintiff argues on page 20 of her brief that the end result of the defendant's action was to "stifle" her speech. This is in essence a moot argument. The plaintiff was never stifled, as she could never have brought the content of her speech to the attention of the public in the first place. The content of the plaintiff's speech involved confidential, private information regarding students' educational records and academic histories. This information is protected by the Buckley Amendment to the General Education Provisions Act, 20 U.S.C. §1232g, and may not be released to the public without the consent of the student and/or her family.

The plaintiff argues on page 15 of her brief that the confidential content of her speech is no bar to First Amendment protection. However, the plaintiff fails to cite to any legal authority in support of her argument. The plaintiff asserts that Givhan holds that "protected free speech rights are not lost simply because the speech is communicated privately to the employer rather than to the public.", 439 U.S. 410, 415-16 (1979). However, Givhan's opinion speaks to a context, rather than content, analysis. Givhan holds open the possibility that some speech may qualify as 'public concern', even though it is voiced within the context of a private conversation. Givhan

does not address a situation where the very content of the speech in question is confidential.

The defendant has presented a very practical, commonsense argument why the plaintiff's speech cannot be afforded Constitutional protection.  Speech only merits First Amendment protection if it addresses a *PUBLIC* concern.  Speech, which concerns private, confidential information, cannot by its very nature ever become a matter of public concern.  The plaintiff has failed to satisfy both prongs of <u>Connick</u> in the present matter.  Not only did the alleged speech occur within the context of private meetings and internal debates amongst co-educators, the very content of the speech involved highly confidential information, which could not be disclosed, as a matter of law, to the public.

### D.     The Plaintiff's Own Authority Supports The Defendant's Arguments.

The plaintiff cites to <u>Flynn v. New York City Board of Education</u>, 2002 U.S. Dist. 18259 (S.D.N.Y.).  **(See attached)**.  As in the present matter, Flynn, also a special education teacher, brought a First Amendment claim against his employer.  Again, like Ms. Sturm, Flynn claimed that his speech constituted 'public concern' as he was advocating on behalf of special education.  <u>Flynn</u> may be useful to the Court's review of this matter as it provides a clear map as to what speech qualified as 'personal concern' and what speech qualifies as 'public concern.'

The <u>Flynn</u> opinion incorporates the same standard set forth in <u>Pickering v. Bd. Of Educ.</u>, 391 U.S. 563, 88 S.Ct. 1731 (1968):  "Factors important to the <u>Pickering</u> test include: the time, place, and manner of speech, the content of the speech...", <u>Flynn</u>, Supra.  Applying these factors, which are essentially another form of the <u>Connick</u> content/context analysis, the <u>Flynn</u> Court held that the following speech did NOT qualify as 'public concern':

- Disagreement between Flynn and his principal over Flynn's teaching methods;
- Disagreement over the qualification of one of Flynn's students for music instruction;
- Debate over the discipline of children in the school; and
- Disagreement with his principal over whether one of Flynn's students should be "transferred out" of the school.

The Flynn Court held that the above speech, "concerned the operation of the school's internal affairs *as they effected him (Flynn) and his students*. These opinions were closely related to his *individual concerns* and do not necessarily become matters of public concern simply because in different circumstances the opinions might become the topic of general interest to the public." Id. (emphasis provided).

Flynn's speech is comparable to that of the plaintiff's in the present matter. One of the plaintiff's alleged instances of speech concerns a January 2002 meeting with her principal and the director of pupil services. This speech involved criticism of the plaintiff's effectiveness as a teacher. Such speech is comparable to the disagreement between Flynn and his principal over Flynn's teaching methods. (¶ 26 of the plaintiff's complaint). This speech was purely personal in content, and only concerned "the operation of the school's internal affairs as they effected", her. As noted in the Flynn opinion, "statements concerning merely private matters, such as personal grievances between employer and employee, are not entitled to First Amendment protection." Id.

The plaintiff has also alleged speech concerning her request that four female students be disciplined and separated. The plaintiff voiced these requests/concerns to the principal, other sixth grade teachers, and a guidance counselor. (¶ 25 of the plaintiff's complaint). Again, such speech is comparable to that voiced by Flynn. Flynn

also discussed the appropriateness of discipline. The Court found that such speech was personal in content, reflecting his own, individual concern over discipline, and the effect that the discipline, or lack thereof, had upon his own teaching. Like Flynn, the plaintiff's speech equally reflects her own individual concern.

Most importantly, Flynn provides guidance concerning the majority of the plaintiff's speech: her 'advocacy' on behalf of students for their admittance into the BRACES program. Flynn's speech involved debates with his principal over whether: (1) a certain student should be transferred out of the school; and (2) whether a certain student merited placement in a music instruction class. In fact, Flynn's allegations concerning the latter sound similar to those allegations in the present plaintiff's complaint. The plaintiff frequently complains that her placement recommendations were ignored or denied. Flynn, "alleges that after insisting that a particular student receive musical instruction, Mrs. Liben (one of the principals) refused to permit the student to participate in musical instruction." Id.

The vast majority of the plaintiff's alleged speech concerns her complaint that her fellow educators either did not follow or denied her recommendation that certain students be placed in the BRACES program. Flynn's ruling shows that such speech is personal in nature as it reflects opinions closely related to the plaintiffs' "individual concerns". As stated above, student placement is a topic debated on a day-to-day basis by educators. Speech concerning student placement reflects an educator's private opinions and personal concerns over a particular student's education. Such speech is therefore 'personal' and 'particularized' by its very nature. Inevitably, such speech involves an educator's personal concerns over her own ability to educate, as student placement is an integral part of an educator's daily duties. Therefore, Flynn holds that speech concerning a particular student's placement does not rise to the level of a 'public concern.'

12

Flynn also provides examples of speech that qualifies as 'public concern': "[C]oncern that special education students be dispersed to mainstream homerooms, math and English classes in accordance with the least restrictive environment mandated by federal law." The Flynn Court found particularly persuasive that such speech was represented as Flynn's "teaching belief" that all students, in general, receive such integration. The Court also took into account Flynn's allegation that his principal rejected this belief.

The plaintiff's speech in the present matter runs counter to Flynn's 'public concern' speech. Unlike Flynn, the plaintiff's speech was primarily concerned with certain, specific students' placement *INTO* a special education program. The plaintiff was not 'advocating' that all the school's students, in general, be integrated into the mainstream classes. Rather, the plaintiff's speech is concerned with specific, *ISOLATED* instances of placement. Her speech does not rise to the level of a general, "teaching belief". In fact, the plaintiff's complaint acknowledges that Flynn's "teaching belief", and the IDEA's goal of mainstream integration was in fact espoused by the defendant board of education's very own policy of 'co-teaching'. (¶¶ 9 and 13 of the plaintiff's complaint).

The plaintiff also cites to Boman v. Pulaski County Special School Dist., 723 F.2d 640 (8th Cir. 1983), (**see attached**) in support of her opposition brief. Like Flynn, Boman's ruling bolsters the defendant's own position. In Boman, two assistant coaches challenged their head coach over his use of physical force, called a 'licking', to discipline students. The plaintiffs alleged that they were fired due to this speech. The Court's analysis focused upon the context of the plaintiff's speech. The Court found particularly persuasive the fact that:

(1) The speech was presented in public, at School Board meetings; and

(2) That the "speech **arose in the context of a public debate** over the actions of an instructor (the head coach). It was not part of an internal office grievance as was the case in Connick." Boman (attached) (emphasis provided).

In the present matter, the plaintiff is not alleging that her speech arose within the context of a "public debate". Boman illustrates the manner in which the plaintiff's speech could merit First Amendment protection. Arguably, if the plaintiff was voicing a concern that the school was following a harmful policy concerning special education, and this concern was voiced at a time when the public at large had raised an interest in special education, then, perhaps, the plaintiff's speech would constitute 'public concern'. However, such a scenario does not exist in the present matter. Again, the plaintiff's speech involves her own individual concern, over isolated instances of student placement into a special education program. These concerns were not voiced in a public forum, such as the School Board Meetings in Boman. Nor did the plaintiff's speech come at a time when special education was seated upon the cusp of the public's attention.

Overall, the plaintiff's arguments fail to satisfy the standards set forth in Connick, Pickering, and the very authority that the plaintiff relies upon. The plaintiff also cites to Lewis v. Cohen, 165 .3d 154 (2nd Cir. 1999). Lewis holds that in reaching a decision as to whether speech is public concern in CONTEXT, "the court should focus on the motive of the speaker and attempt to determine whether speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis, 163-64.

The plaintiff admits that the motive behind her speech did not represent a "broader public purpose." In fact, the plaintiff admits in her argument that "Ms. Sturm was not advocating generally about special education." (Plaintiff's opposition brief,

14

page 19).  The plaintiff was not challenging the school's policies/practices concerning special education, in general.  The plaintiff's speech does not identify or challenge a policy/practice.  The plaintiff's speech does not collectively constitute a public attack/challenge of the defendant's treatment of its students and the defendant's administration of its special education programs.  Rather, the plaintiff's speech represents isolated, individual instances in which she recommended certain students for placement into a special education program.  Most of this speech also communicates' the plaintiff's personal frustration that her recommendations were either being ignored or denied by her principal and co-educators.  The plaintiff's speech merely represents her personal dissatisfaction with the conditions of her employment.  Thus, neither the content nor the context of the plaintiff's speech constitutes a 'public concern'.  "[S]peech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." Id. at 164.

**E.**     **The Plaintiff Has Failed To Assert A Claim Against The Municipal Defendant, In Accordance With The Standards Set By Monell v. Dep't of Soc. Services.**

The plaintiff argues that she has brought a proper claim against the municipal defendant, in accordance with the standards laid out in Monell v. Dep't of Soc. Services, 436 U.S. 658, 690 (1978).  The plaintiff cites to numerous decisions, yet fails to acknowledge the very standard set forth within the body of the Monell opinion, itself: that in order to bring a claim against a municipality the plaintiff must allege (1) a policy or practice of the municipality; and (2) a decision rendered by an official with

policymaking authority. Both the plaintiff's complaint and argument are devoid of both essential elements.

In order to successfully plead a claim against a municipality, pursuant to 42 U.S.C. § 1983, a plaintiff must follow the pleading requirements spelled out in Monell. First, the plaintiff must assert, "the alleged constitutional violation was caused by the entity's policy or custom." Mandell v. County of Suffolk, 316 F.3d 368, 385 (2nd Cir. 2003); citing to Monell at 694. "The policy or custom requirement… is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible." Mandell at 385; citing to Dangler v. New York, 193 F.3d 130, 142 (2nd Cir. 1999). Second, the plaintiff must, in the alternative, show that the challenged action was directed by an official with final policymaking authority. "Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." Mandell at 385.

As stated in the defendant's above arguments, the plaintiff has not alleged that her speech challenged a general policy or practice of the municipal defendant. The plaintiff is not alleging that her speech was made in response to an official policy/practice concerning special education. Again, as stated above, the plaintiff admits that she "was not advocating generally about special education." (Plaintiff's opposition brief, page 19). Rather, the plaintiff's speech involved isolated instances in which she recommended certain, individual students for placement in the BRACES program. The plaintiff's speech did not address anything so broad and/or general as a school policy or practice. The only practice referenced in the plaintiff's complaint is the principal's, Ms. Marino, "co-teaching" model. The plaintiff's speech did not challenge this "co-teaching" model.

Not only does the plaintiff fail to identify a policy and/or practice, the plaintiff also fails to allege that an official with "final policymaking authority", made the decision to not renew her teaching contract. The plaintiff mistakenly argues that any decision to hire or fire a public teacher ultimately resides with the superintendent, and therefore the challenged action involved an official with "final policymaking authority." The plaintiff ignores the fine, yet essential distinction that a party must show that the challenged action was *DIRECTED* by such an official. It is not enough to show that official with policymaking authority 'signed-off' on a decision. Rather, the plaintiff's principal, Ms. Marino, after consulting with her staff, made the decision that the defendant did not wish to renew the plaintiff's contract. Ms. Marino was not an official with "final policymaking authority." Ms. Marino and her staff, not the superintendent, directed the challenged action.

In the alternative, even if the plaintiff is able to show that an official with final policymaking authority was involved in the challenged action, the plaintiff has still failed to assert the first, necessary component of a <u>Monell</u>-style claim: that the alleged Constitutional violation was caused by a policy or practice. The plaintiff has failed to identify any such policy or practice in her complaint. The plaintiff has failed to cite to any legal authority which states that she need not identify such a policy/practice in order to successfully state a claim against a municipal entity. The plaintiff has simply failed to assert a claim against the municipal defendant.

## II.   THE PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER C.G.S. §31-51q.

The plaintiff argues in her opposition brief that causes of action brought pursuant to 42 U.S.C. §1983 and C.G.S. §31-51q are two 'distinct vehicles.' However, as the defendant has asserted on page 19 of its memorandum in support of its Rule 12(b)(6) motion to dismiss, both causes of action are governed by the same standard

set forth in Connick v. Myers, and therefore invite the same legal analysis. The plaintiff does not submit any authority which states otherwise. The defendant therefore incorporates its legal arguments as set forth in Section III. (A)1, sub-sections a. through e. of its Rule 12(b)(6) motion to strike, and those arguments set forth in Section I. of this reply brief.

## III.     THE PLAINTIFF HAS FAILED TO ASSERT A CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT.

The plaintiff's argument in support of her claim under Section 504 of the Rehabilitation Act runs against the stated purpose of this act. Section 504 of the Rehabilitation Act provides in part that, "[n]o otherwise qualified individual with a disability… shall solely by reason of *her disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (Emphasis provided). The plaintiff argues that she need not allege that she suffers from a disability, in order to bring a claim for retaliation under Section 504. The plaintiff's position ignores the very purpose of the Act: to protect individuals with disabilities. The plaintiff would have this Court expand the scope of the Rehabilitation Act far beyond its already well-established parameters.

Admittedly, Section 504 incorporates the anti-retaliation provision of Section 503 of the American with Disabilities Act ('ADA'). Admittedly, in order to establish a prima facie case for retaliation under the Rehabilitation Act, a plaintiff must show that: "(1) he engaged in a statutorily protected activity; (2) the employer was aware of the activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). The plaintiff's analysis is

based on the first element.  The plaintiff's analysis, however, fails to recognize the manner in which this first element is defined: "**[t]he act or practice made unlawful by the Rehabilitation Act is *discrimination, solely by reason of ... his (i.e., the plaintiff's) disability*.**"  Duncan v. Washington Metropolitan Area Transit Authority, (D.C. 2003) (emphasis provided) (**attached**); citing to 29 U.S.C. § 794(a); see also Fetto v. Sergi, 181 F.Sup.2d 53 (Conn. 2001); Nichols v. Harford Cty. Bd. Of Educ., 189 F.Supp.2d 325 (Md. 2002).

The plaintiff mistakenly cites to Shellenberger v. Summit Bancorp, 318 F.3d 183, 188 (3d. Cir. 2003) (see page 27 of the plaintiff's opposition brief), in support of her argument that failure to allege a 'disability' does not prevent her from recovering under Section 504.  The Shellenberger opinion only addresses the ADA, not the Rehabilitation Act.  The plaintiff has not provided any authority, which holds that she need not allege a disability in order to bring a retaliation claim under the *Rehabilitation Act*.

The Rehabilitation Act was designed to address disability discrimination.  The plaintiff's complaint is completely devoid of any reference to disability.  The plaintiff is not alleging that her employment was terminated in retaliation for her disability, or for speaking out against discrimination against her disability.  The plaintiff's argument ignores the very stated purpose of the Rehabilitation Act, and produces the illogical result whereby a plaintiff could bring a cause of action, under an Act specifically designed to address 'disability', for the violation of any protected activity.

## IV.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DEFAMATION

### A.    The Plaintiff Has Incorrectly Applied C.G.S. § 52-557n, In Attempt To Abrogate The Defendant's Governmental Immunity.

19

In general, municipalities are immune from liability, unless that immunity is abrogated by a specific statute. See <u>Caruso v. Milford</u>, 75 Conn.App. 95 (2003). Nevertheless, the plaintiff claims that the municipal defendant is liable for the intentional tort of defamation. The plaintiff acknowledges on page 28 of her brief that municipal entities may not be held liable for the intentional torts of its employees. However, she claims that C.G.S. § 52-557n (a)(2)(A) abrogates that immunity, as defamation involves the intentional element of 'actual malice', and the aforesaid statute abrogates immunity in the case of 'actual malice'.

The plaintiff's argument is based upon a misreading of the statute. On the contrary, Section 52-557n(a)(2)(A) enforces the rule that a municipality may *NOT* be held liable for acts of its employees that constitute 'actual malice'. The statute reads in relevant part: "Except as otherwise provided by law, a political subdivision of the state ***shall NOT be liable*** for damages to person or property caused by: (A) acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, ***actual malice*** or willful misconduct…". (emphasis provided). Other than §52-557n, the plaintiff does not cite to any other statute in support of her argument.

**B.    <u>The Plaintiff Has Failed To Allege Actual Malice.</u>**

In the alternative, even if the plaintiff located a statute that abrogated the defendant municipality's liability, the plaintiff has failed to properly allege 'actual malice'. The Supreme Court has interpreted the term "actual malice" to "require proof that the defendant published a statement with knowledge of its falsity or with a high degree of awareness of the publication's probable falsity," <u>Garrison v. Louisiana</u>, 379 U.S. 64, 74 (1964), or "while the defendant in fact entertained serious doubts as to the truth of the publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968). See also <u>Gertz v. Robert Welch Inc.</u>, 418 U.S. 323, 335 & n. 6 (1974) (requiring proof of

"subjective awareness of probable falsity"). "[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false." Liberman, supra at 438.

The plaintiff identifies the specific instance during which the defamation allegedly occurred in ¶¶48-49 of her complaint. The plaintiff claims that these defamatory comments arose when Mr. Russo, a Glastonbury principal, contacted Ms. Miller and Ms. Young, two of the defendant's employees, during a reference check. The plaintiff specifically identifies this defamatory statement as consisting of Ms. Miller and Ms. Young's representation that the "Rocky Hill Board of Education would not rehire Ms. Sturm." (page 28 of the plaintiff's opposition brief; ¶¶48-49 of her complaint).

This statement does not reflect 'actual malice.' It does not reflect a 'subjective awareness of probable falsity'. The plaintiff admits in her complaint that during her March 15, 2002 meeting with Principal Marino she was told that her contract was not being renewed, and that she would not be able to transfer to another school within Rocky Hill. (plaintiff's complaint, ¶29). Ms. Miller and Ms. Young's statements accurately represented the defendant's stance on the possibility of rehiring the plaintiff: that it was not in fact rehiring the plaintiff in another school in its district. The plaintiff has not alleged that Ms. Miller and Ms. Young's statements were false or were made with a high degree of awareness of the statements' falsity.

In fact, the plaintiff has herself voiced an awareness of the accuracy of these statements. She admits in her complaint, that Ms. Marino told her that she "had no doubt that she (the plaintiff) would be teacher of the year *in another district*." (plaintiff's complaint, ¶29) (emphasis provided). The plaintiff could not have possibility understood this to mean anything else other than a statement of the defendant's refusal to rehire her.

Regardless, even if the Court finds these statements were made with actual malice, the defendant is still immune from suit. The defendant therefore moves to strike the plaintiff's defamation claim.

## V.    THE PLAINTIFF HAS FAILED TO STATE A 'FALSE LIGHT' CLAIM.

### A.    The Defendant Is Immune From The Plaintiff's Claim.

Like defamation, false light constitutes an intentional tort. As in her argument on defamation, the plaintiff incorrectly interprets C.G.S. § 52-557n(a)(2)(A) as abrogating the immunity, which protects municipalities from suit for the intentional, tortious acts of their employees. As stated in the above Section IV. A. of this brief, §52-557n(a)(2)(A) actually underscores that a municipality *MAY NOT* be held liable for the "criminal conduct, fraud, actual malice or willful misconduct," of its employees, "except as otherwise provided by law." Other than citing to §52-557n, the plaintiff does not identify any other statute by which this immunity may be abrogated. The defendant is immune from the plaintiff's 'false light' claim.

### B.    The Plaintiff Has Failed To Establish The Necessary Element Of 'Publication'.

Assuming that the plaintiff could locate a statute, which abrogated the defendant's aforesaid immunity, the plaintiff still fails to establish the pivotal element of a 'false light' claim: 'publication'. In support of her argument, the plaintiff cites to <u>Nolfi v. Melson</u>, Superior Court, judicial district of Fairfield at Bridgeport, docket no. CV 99 0360876 S (June 12, 2000, Moran, J.) (**attached**). <u>Nolfi</u> stands for the proposition that: "to satisfy the element of publicity under an invasion of privacy by false light claim, the plaintiff must show that the matter is made public by communicating it to the

22

public at large, or to so many persons that the matter must be regarded as substantially certain to become **one of public knowledge**, thus it is not an invasion of the right of privacy… to communicate a fact concerning the plaintiff's private life to a **single person or even to a small group of persons**." <u>Nolfi</u> (attached) (emphasis provided).

The plaintiff argues that 'publication' occurred within the confines of a private, confidential reference check phone call.  This call involved three people, Mr. Russo, the inquiring prospective employer, Ms. Young and Ms. Miller.  The plaintiff reasons that the industry that she works in is small, and therefore it was substantially certain that the contents of this conversation would soon circulate through this small industry. (page 29 of the plaintiff's opposition brief).

The plaintiff ignores the rule presented in <u>Nolfi</u>.  <u>Nolfi</u> states that publication occurs, where the statement is made to so many persons "that the matter must be regarded as substantially certain to become **one of public knowledge**." <u>Id</u>. (emphasis provided).  The plaintiff is arguing that her industry is small, and that therefore the contents of the subject reference check phone call would quickly disseminate through the ranks of the **school system**.  However, alleging that a statement might possibly spread, *INTERNALLY*, throughout a small, self-contained industry, is completely different from alleging that the communication reached the *PUBLIC* at large.

The alleged statement was made within the context of a confidential conversation between three public school employees.  Furthermore, the conversation involved a reference check, a form of communication which by its very nature is private and confidential. The plaintiff has failed to allege any facts in support of 'publication'.  As the plaintiff admits in her own brief, "it is not an invasion of the right of privacy… to communicate a fact concerning the plaintiff's private life to a single person

*or even to a small group of persons*." Nolfi (attached) (emphasis provided) (page 29 of the plaintiff's opposition brief).

C.    **C.G.S. § 31-128f.**

The plaintiff asserts that she is not bringing an additional claim pursuant to C.G.S. § 31-128f. However, the plaintiff has cited to this statute in support of her claims for defamation and false light/invasion of privacy. The plaintiff may not now bootstrap a claim under §31-128f to either of these two claims.

## VI.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR WRONGFUL DISCHARGE.

In order to sustain the pleading requirements for a claim of wrongful discharge, the plaintiff must show that her termination violated a public policy. The plaintiff argues that: (a) her speech involved 'education', and therefore all speech involving education naturally invokes, "judicially conceived notions of public policy", and (b) that she may rely upon the public policy invoked in 20 U.S.C. §1400, et seq., aka the Individual with Disabilities Education Act ('IDEA').

### A.    The Plaintiff Has Failed To Identify An 'Important And Clearly Articulated Public Policy.'

The plaintiff relies upon the rule established in Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471 (1980), and its progeny, which states that a plaintiff when alleging 'wrongful discharge', must either identify some statutorily defined public policy, or "any judicially conceived notion of public policy." The plaintiff proceeds to argue that her speech constituted 'advocacy' on behalf of education, and therefore must involve some 'judicially conceived notion of public policy.'

24

Sheet's progeny has further defined the 'judicially conceived' alternative to public policy as defined by statute. These cases state that it is not enough to make the blank assertion that speech triggers a judicially conceived notion of public policy. The plaintiff must point to some specific ruling, which identifies and specifically defines, "an important and **clearly articulated** public policy." Fenner v. Hartford Courant, 77 Conn.App. 185, 196-97 (2003); citing to Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 701, 802 A.2d 731 (2002).

For instance, in Raible v. Essex Yacht Club, Inc., Superior Court, judicial district of New London at New London, docket no. CV 03 0564783 S (August 19, 2003, Hurley, J.) (**attached**), the court held that the plaintiff had alleged a 'judicially conceived notion of public policy', as she had cited to other court decisions which held that speech, similar to that alleged by Raible, implicated public policy. However, in Parker v. Ginsburg, Superior Court, judicial district of Stamford/Norwalk at Stamford, docket no. CV 02 0188873 S (August 8, 2003, Lewis, J.) (**attached**), the court granted the defendant's motion to strike, as the plaintiff had failed to specifically identify the public policy. The Parker court emphasized, "[o]ur Supreme Court, however, has repeatedly underscored our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a **narrow** one." Parker; citing to Thibodeau v. Design Group One Architects, LLC, at 701 (emphasis provided).

The plaintiff likewise fails to identify a clearly articulated public policy, as established by prior judicial rulings. The plaintiff argues that she was 'advocating' on behalf of her students and education, and that this speech therefore invokes some form of public policy protection. However, the plaintiff has failed to identify a public policy that protects teachers each and every time they speak out on behalf of the subject of their employment: education.

25

Furthermore, the plaintiff's speech did not constitute advocacy. As stated throughout all the previous sections of this reply brief, an examination of the context/content of each individual instance of the plaintiff's speech shows that the plaintiff's speech did not rise to the level of 'advocacy'. Rather, the plaintiff's speech documents individual, isolated instances in which she recommended a student for placement in the BRACES program. This speech also documents her co-educators' and principal's disagreement with these particularized recommendations. It is conceded that the plaintiff's speech involved matters of education. However, this speech did not involve anything so grand as 'advocacy' on behalf of education.

The plaintiff's argument rests on the assumption that there exists some public policy which protects all speech that touches upon education. Again, as asserted above, discussion/debate over student placement is part of the day-to-day internal, administration of a school system. As a matter of course, teachers are regularly evaluated on their ability to educate and provide for their students' academic growth. Such evaluation inherently includes a teacher's ability to place her students in the proper academic settings. Student placement is part of an educator's regular duties. Debate and disagreement over student placement is a regular and frequent occurrence within the internal administration of a school system. The plaintiff would have this Court recognize a public policy that protects teachers whenever they speak about matters of education and student placement. Recognition of such a policy would be just as unrealistic and untenable as recognizing all speech touching upon education as meriting First Amendment protection.

**B.**    **The Plaintiff May Not Rely On The 'IDEA'.**

In the alternative, the plaintiff argues that she has invoked the IDEA, and that she may therefore rely upon the IDEA to satisfy her public policy pleading requirement.

26

However, as the defendant demonstrated on page 32 of its motion to dismiss, the plaintiff may not rely on the policy contained in the IDEA's language, as this statute was designed to protect children with disabilities. In order to invoke a statute in support of a wrongful termination claim, the employee invoking the statute must be a member of the class of persons that the statute was designed to protect. See Dray v. New Market Poultry Prods., Inc., 258 Va. 187, 191-92, 518 S.E.2d 312, 314 (1999).

The plaintiff does not present any authority in opposition to the aforementioned rule, besides arguing that Dray is a Virginia case, and therefore does not provide any guidance. However, Connecticut has also endorsed this rule when reviewing wrongful discharge claims. In D'Ulisse-Cupo v. Board of Directors of N.D.H.S., 202 Conn. 206, 520 A.2d 217 (1987), the Connecticut Supreme Court held that the plaintiff (also a teacher) was not a member of the class of persons, and therefore granted a motion to strike her claim of wrongful discharge. Id. at 221. The plaintiff may not rely upon the IDEA, as she is an adult teacher, not a "disabled child", and therefore falls outside the scope of the statute's protection.

## VII.    CONCLUSION

WHEREFORE, for the aforesaid reasons, and for those reasons voiced in the defendant's memorandum in support of its motion to dismiss, the defendant asks that the Court dismiss the plaintiff's complaint in its entirety.

DEFENDANT,
ROCKY HILL BOARD OF EDUCATION


By _____
Eric D. Eddy  [ct25242]
Michael J. Rose [ct14803]
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT  06114
Phone:  (860) 249-1361
Fax:  (860) 249-7665
E-Mail:  eeddy@hl-law.com
E-Mail:  mrose@hl-law.com


## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via US Mail to the following counsel of record this 26th day of April, 2004.

Gary Phelan, Esquire
Tammy Marzigliano, Esquire
Gary Phelan, L.L.C.
Corporate Center West
433 South Main Street, Suite 117
West Hartford, CT  06110


_____
Eric D. Eddy